In re John B. KENNEDY, Esquire, a member of the Bar of the Supreme Court of the State of Delaware.

Supreme Court of Delaware.

Submitted (Nos. 204 & 205, 1982): April 11, 1983 *.

Submitted (Nos. 60 & 75, 1983): Oct. 17, 1983.

Decided: Jan. 24, 1984.

---

* Issuance of a decision in Nos. 204 and 205, 1982, submitted on April 11, 1983 was deferred until this time in order for the Court to address the common issues of law raised in Nos. 60 and 75, 1983, submitted on October 17, 1983.

O. Francis Biondi (argued), Wilmington, for Bd. on Professional Responsibility as to Nos. 204, 1982 and 60, 1983.

F. Alton Tybout (argued), Wilmington, for Bd. on Professional Responsibility as to No. 205, 1982.

Walter S. Rowland (argued), Wilmington, for Bd. on Professional Responsibility as to No. 75, 1983.

Samuel C. Stretton (argued), West Chester, Pa., for respondent.

Before McNEILLY, HORSEY and MOORE, JJ.

McNEILLY, Justice.

Several matters concerning John B. Kennedy, a member of the Bar of the State of Delaware, are before the Court for decision.

I

The Board on Professional Responsibility (hereinafter "Board"), an agency of this

Court created under Supreme Court Rule 62, has held hearings involving separate charges of professional misconduct against Kennedy and has filed four Final Reports stating findings of fact and conclusions of law. The Reports are as follows:

As to representation of Karen Everett (No. 204, 1982)

### FINDINGS OF FACT

1. In the latter part of 1978, you were retained by Karen Everett to represent her in the Family Court of the State of Delaware in connection with a divorce, support proceedings, property division and a request for alimony from her husband, Joseph Everett.

2. On October 31, 1979, the hearing on the applications for alimony and attorney's fees was held. Immediately prior to the hearing, your failure to file an affidavit of dependency, as required by 13 *Del.C.* § 1512(a), was raised by the husband's counsel. Nevertheless, you did not put an affidavit in the record but argued that this was not necessary so long as the subject was covered by the testimony of your client.

3. On January 7, 1980, Judge Horgan rendered a written decision and order denying alimony to your client on the ground that the court lacked jurisdiction because you failed to file the affidavit of dependency as required by 13 *Del.C.* § 1512(a), and denying the application for attorney's fees to be awarded to your client against her husband on the ground that the affidavit you submitted in support of the application for attorney's fees was insufficient.

4. When the decision of Judge Horgan referred to in paragraph 3 above was received by you, you failed to take the necessary steps to remedy the procedural deficiencies you had caused to prevent loss or further delay or expense to your client. Specifically:

A. You made no motion for reargument, nor did you attempt to seek to cure the deficiency in your affidavit on attorney's fees.

B. You refused to discuss the decision on the telephone with Karen Everett, and did not arrange to meet with her in your office until the time for reargument had passed and her rights were further injured or delayed.

C. On February 4, Karen consulted Roderick McKelvie, Esquire, who recommended that she have you file a protective appeal and then bring the file to him for review. You refused to prepare or file the one-page notice of appeal unless paid in advance for that service.

5. You then refused to turn over the file or make it available when requested by the client, under the following circumstances:

A. Mrs. Everett told you she wished to terminate your services and retain Mr. McKelvie to pursue an appeal. McKelvie requested the file from you by telephone before the notice of appeal was prepared and wrote a letter to you on February 12, 1980, requesting an opportunity to review the file.

B. You refused to release the file on the ground that Karen Everett still owed you attorney's fees.

C. Nevertheless, you refused a request to submit a statement to Karen Everett for the attorney's fees you claimed to be due.

D. Subsequently you refused to release the file to Karen Everett unless she first signed a general release to you and paid a $40 charge for photocopying, even though Mrs. Everett told you they were necessary to premit her new attorney to pursue her appeal.

E. You did not release these papers until Henry Herndon, Esquire, then Chairman of the Censor Committee, and Victor F. Battaglia, Esquire, then

President of the Bar Association, intervened on her behalf in March, 1980.

## CONCLUSIONS OF LAW

1. The actions described in paragraphs 1 through 5 of the Findings of Fact are in violation of DR6–101(A)(2) and (3) and DR7–101(A)(1) and (2) of the Code of Professional Responsibility.

2. The conduct described in paragraph 5 of the Findings of Fact was in violation of DR2–110(a)(2) of the Code of Professional Responsibility.[1]

As to representation of Robert A. Book (No. 205, 1982).

## FINDINGS OF FACT

1. Robert A. Book suffered a personal injury while working as a groundsman at the Valley Run Apartment complex on July 28, 1980. Mr. Book believing the accident to be a direct result of negligence on the part of his employer, Gilpin, Vantrump, and Montgomery, contacted John B. Kennedy, Esq. on July 29, 1980 and received legal services. Mr. Kennedy agreed to represent Mr. Book and presented to Mr. Book a "contingent fee contract" obligating Mr. Book to pay Mr. Kennedy forty percent (40%) of any set-

tlement "made by me (Book) directly or through John B. Kennedy together with cost of any necessary action." If there were to be an appeal to the Superior Court or the Supreme Court in the course of the litigation, the contingent fee would be raised to forty-eight percent (48%) of any recovery. In the section of the agreement or contract entitled "Special Agreements", Mr. Kennedy's handwriting adds "this agreement pertains to all compensation including total temporary disability payments, permanency, etc., which is recoverable by client. This contract pertains only to Workman's Compensation case against Gilpin." The agreement is dated July 29, the year is blank. It is apparent that this handwritten portion of the agreement was read by Mr. Book. The initials KAB appear in the section of the handwritten portion of the agreement.

2. Mr. Kennedy contacted Mr. Book's employer stating his client's position to be that he is entitled to Workman's Compensation relief and requested that the letter be considered a claim to be forwarded to the Company's Workman's Compensation insurance carrier. Mr. Kennedy scheduled an appointment with an orthopedic surgeon for an examination of Mr. Book. Mr. Kennedy solicited and received from

1. The Code of Professional Responsibility provides as follows:
 DR6–101(A)(2) & (3)
 (A) A lawyer shall not:
 \* \* \* \* \* \*
 (2) Handle a legal matter without preparation adequate in the circumstances.
 (3) Neglect a legal matter entrusted to him.
 DR7–101(A)(1) & (2)
 (A) A lawyer shall not intentionally:
 (1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7–101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with

courtesy and consideration all persons involved in the legal process.
 (2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR2–110, DR 5–102, and DR 5–105.
 DR 2–110(a)(2)
 (A) In general.
 \* \* \* \* \* \*
 (2) In any event, a lawyer shall not withdraw from employment until he has taken reasonable steps to avoid forseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled and complying with applicable laws and rules.

Mr. Book a handwritten statement of how the accident occurred and took notes on his interview with Mr. Book. A medical authorization and an authorization to request employment records was obtained from Mr. Book. Mr. Kennedy wrote the Silverside Medical Center for reports concerning Mr. Book's injuries. On August 5, 1980, Mr. Kennedy was informed by Gilpin that they recognized he was entitled to relief under Workman's Compensation insurance. The first temporary total check was sent by Aetna Life and Casualty, the Workman's Compensation carrier, on August 13, 1980. An Agreement as to compensation was prepared and signed by Mr. Book on or about August 13, 1980. On July 29, 1980, Mr. Kennedy prepared and mailed on July 31, 1980 a Petition to Determine Compensation Due to Injured Employee with the Industrial Accident Board. In that Petition, Mr. Kennedy alleged that Mr. Book and his employer had failed to reach an agreement in regard to compensation due him as an employee of Gilpin, Vantrump, and Montgomery, Inc. On July 29, 1980, Mr. Kennedy had Mr. Book sign a Power of Attorney granting Mr. Kennedy full rights to collect, sign, and deliver checks and to deposit or withdraw money from all of Mr. Book's checking and savings accounts. Mr. Book tendered $100 cash to Mr. Kennedy for expenses. However, Mr. Kennedy has no record of receipt of the payment. We find that Mr. Kennedy has no record keeping system in place to document cash receipts for attorney's fees.

3. On August 15, 1980, Mr. Book was informed by Mr. Kennedy that a check had come to his office and that Mr. Book could come in and pick it up. The temporary total payment to Mr. Book was a bi-weekly payment in the amount of $166.16, however, Mr. Kennedy delivered a check to Mr. Book for $83.08, which was exactly one-half of Mr. Book's entitlement. Mr. Kennedy explained that a portion of the check was taken to pay for the orthopedic examination and report. On September 2, 1980, Mr. Book went to Mr. Kennedy's office to pick up an additional disability check. The check again was in the amount of $83.08, one-half of Mr. Book's entitlement. Mr. Kennedy then informed Mr. Book that there was no mistake because he would be taking fifty percent (50%) of the temporary total disability check as legal fees. Testimony revealed that Mr. Kennedy had altered the prior "contingent fee agreement" because Mr. Book could not advance costs. Mr. Kennedy increased the contingent fee from forty percent (40%) to fifty percent (50%) and stated he would cover the costs of the litigation in exchange for the increase in the contingent fee.

4. Mr. Elder of Aetna testified that Mr. Kennedy's imput in two telephone calls to the company had no affect "sic" on the company's decision to pay temporary total. Aetna never challenged nor disputed Mr. Book's right to temporary total payments. Based on the statements of Mr. Book's employer, Gilpin, and the insurance carrier, we find there was never a dispute over compensation for temporary total disability under the Workman's Compensation statute. We further find that in addition to the contingent fee arrangement entered into between Mr. Book and Mr. Kennedy, Mr. Kennedy charged $10 per consultation on each of two separate occasions. We further find that an additional $100 was delivered by Mr. Book to Mr. Kennedy upon his second visit to Mr. Kennedy for consultation obstensibly for physician's fees.

5. Testimony of Morton Kimmel, an experienced Workman's Compensation plaintiff's attorney, established a standard in the community whereby practice in New Castle County of attorneys experienced in temporary total disability claims is to charge no fee where there is no dispute and no litigation on a temporary total issue. Further, the practice

generally is to conform to the Board's standard set forth in 19 *Del.C.* § 2127 whereby thirty percent (30%) or $2,250, whichever is less, is a standard fee for permanency recoveries.

6. There is no evidence of any substantial amount of time expended by Mr. Kennedy on Mr. Book's behalf in regard to temporary total disability or that any legal effort was involved in establishing Mr. Book's right under the Workman's Compensation statute to receive temporary total disability payments. There is no evidence that Mr. Kennedy's activity on behalf of Mr. Book precluded him from representation of other clients in unrelated matters. We find that Mr. Kennedy's efforts were insignificant and/or unrelated to the decisions of the employer and the employer's insurance carrier to pay Mr. Book temporary total disability. We find there were no significant time limitations imposed by Mr. Book on Mr. Kennedy and in fact no need for the filing of the Petition before the Industrial Accident Board as soon as July 29, 1980. We find that neither Mr. Kennedy's performance, experience, reputation, nor ability had any affect on the fee arrangement entered into in regard to its amount or duration. We find that assessment of a fifty percent (50%) fee against a temporary total disability payment to be an alleged "contingent fee" recovery when in fact payments were not contingent upon any litigation or resolution of any issue of fact or law.

### III

### CONCLUSIONS OF LAW

Respondent has violated Disciplinary Rule 2–106(A) by charging a clearly excessive fee to Mr. Book. Assessing fifty percent (50%) of a temporary total disability check as an attorney's fee with or without the existence of a purported contract involving the consent of the client is in fact establishing and collecting a fee that is clearly excessive as a matter of law. The guidelines established in DR2–106(B) when applied to the facts found by the panel show that none of the factors involved existed in Mr. Kennedy's professional relationship with Mr. Book. Testimony established that a fifty percent (50%) contingent fee for a clear entitlement to temporary total disability without any requisite litigation or resolution of issues of fact or law is substantially in excess of the fee customarily charged in this state for the recovery of temporary total disability payments. We conclude that the facts established that no substantial amount of time or legal effort was entailed in obtaining temporary total disability compensation for Mr. Book. We find that the representation of Mr. Book did not preclude Mr. Kennedy from any other employment. We conclude that Mr. Kennedy achieved no significant results as a result of his representation of Mr. Book. We conclude that time was not a significant factor in Mr. Kennedy's efforts and that there was no other professional relationship between Mr. Kennedy and the client to justify imposition of a fifty percent (50%) contingent fee. Mr. Kennedy's experience, reputation, and ability were not factors in calculating the fee since there was really no legal effort involved whatsoever in obtaining the temporary total disability. The absence of an issue of law or fact that would make the entitlement contingent upon legal efforts on Mr. Book's behalf removes any consideration of the fee assessed as a "contingent fee." The fee as assessed by Mr. Kennedy was a fixed fee automatically charged to a temporary total disability check and not contingent upon recovery of a sum uncertain. Assessment in addition to the alleged contingent fee of a $10 consultation fee for each office visit further underscores the excessiveness of the fee. While there seems to be some confusion in the mind

of the complainant about the applicability of the contingent fee to Workman's Compensation payments or to a third party liability suit, it is clear that Mr. Kennedy assessed the fee against a fixed certain entitlement to temporary disability payments and not against an uncertain recovery from litigation. We must, therefore, conclude, that Mr. Kennedy entered into an agreement for a clearly excessive fee, charged, and in fact collected a clearly excessive fee in violation of DR2–106(A).[2]

As to representation of Clara Tingle (No. 60, 1983)

## COUNT I

*Findings of Fact:*

1. The Respondent represented one Ms. Clara Tingle before the Honorable Barbara C. Hughes, Justice of the Peace in Court No. 15 of the State of Delaware on May 28, 1981, for an alleged violation of 21 Del.C. § 4177(a) (driving under the influence). Corporal Michael Gunning of the Delaware State Police presented the case at trial for the State.

2. Judge Hughes has been a Justice of the Peace since January 13, 1977.

3. After numerous continuances had been granted to the Respondent's client, the matter proceeded to trial on May 28, 1981, at J.P. Court No. 15 in New Castle, Delaware.

4. During the course of the trial, the Respondent continually interrupted the testimony of witnesses with objections made in a disorderly, excitable, demonstrative manner. Respondent would not allow witnesses called by him to answer questions directed to them. The Court cautioned the Respondent to allow the witness to answer questions but the Court's directions were ignored. The Respondent harassed his own client on the stand to such an extent that she "broke down" and volunteered to "take anything", "do anything but you," (the Respondent), "get me out of here". Respondent's conduct in the Courtroom drove his own client to the "verge of hysteria." The Respondent during the course of the trial shouted and raised his voice to the witnesses and to the presiding Judge. At the conclusion of the trial, the State Police Officer representing the prosecution requested that the Court declare a mistrial based upon the behavior of defense counsel urging the Court to take the action because of the state of mind of the defendant in that she was not able to adequately defend herself and further on the basis that the Respondent had made a "total mockery of the system".

5. During the course of the hearing, the Respondent engaged in a yelling or shouting match with the prosecuting officer. The Judge left her chambers and instructed counsel to be quiet. During

---

**2.** The Code of Professional Responsibility provides:

DR2–106(A) & (B).

(A) A lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee.

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

the course of testimony the Respondent attempted to intimidate witnesses by cutting off their answers, asking multiple questions persistently, and by arguing with their responses. Objections were made to testimony and Respondent interrupted any response from the State to the basis for his objection. When an attempt to respond to his objection was made he would interrupt the objection to further clarify and explain his own. During the course of objecting to answers by witnesses the Respondent would direct his argument and objections to the witness in the course of interrupting them rather than to the Court. During the course of the Respondent's examination of his own client, his client, because of his actions, requested that he "just sit down—you are making things worse". His client was shaken to the point of crying, breaking down emotionally, and requesting to plead guilty. The client's emotional condition directly caused by Respondent's actions in the Courtroom prompted the State to request a mistrial.

6. After considering the actions of the Respondent, the Court granted a mistrial.

7. After the mistrial and before a new trial had been scheduled Respondent presented an Affidavit to his client requesting that she "swear and say that she was happy with his services". The Defendant brought the Affidavit to the attention of the presiding Judge who suggested that it be taken to the Attorney General's Office.

*Conclusions of Law:*

9. DR 1–102(A)(5) provides in defining misconduct that "a lawyer shall not: (5) engage in conduct that is prejudicial to the administration of justice."

The Committee unanimously finds that the Respondent has violated DR1–102(a)(5) by conducting himself in an undignified, discourteous, rude, and abusive manner to the witnesses during the course of the trial, to the opposing prosecutor for the State, and to the presiding Judge of the tribunal. The actions of the Respondent:

(a) in raising his voice in the Courtroom;

(b) by refusing to respond to the Court's demands that he state the basis for his objections;

(c) by interrupting, intimidating and cutting off witnesses before they finished their answers;

(d) by addressing arguments directly to witnesses instead of to the Court;

(e) by engaging in a yelling match with the prosecutor during a recess necessitating the presiding Judge to leave her Chambers and instruct him to be quiet; and

(f) by abusing his own client on the stand to such an extent that she begged for the opportunity to plead guilty just to get out of the Courtroom;

all constitute conduct prejudicial to the administration of justice. The culmination of the conduct resulted in a mistrial thereby frustrating the entire process made available for the protection of his client's rights and the prosecution of the public's interest.

## COUNT TWO

*Findings of Fact:*

1. The Committee adopts the same facts found above particularly emphasizing the actions of the Respondent in refusing to follow the instructions of the Court. The Respondent's failure to treat the Court with decorum and courtesy by slamming books on the table during the course of the trial, by raising his voice over the remonstrances of the Court all constitute the factual basis for finding undignified and discourteous conduct degrading to the Justice of the Peace Court.

*Conclusions of Law:*

2. The Committee, based upon the facts above, unanimously concludes that

the actions of Respondent as described by all of the witnesses violate DR 7–106(C)(6). The Respondent's conduct toward the Court, as an officer of the Court, directly related to a lack of responsibility and a total disregard of the respect an officer of the Court owes to the judiciary. The position of all persons present in the Courtroom on this particular evening were degraded and insulted by the actions of the Respondent. Therefore, the Panel concludes the facts are sufficient to find a violation of DR 7–106(C)(6).

3. The Panel, therefore, concludes and recommends that the Respondent be disciplined for the above violations. In addition to the above, the Panel takes special note of the fact that on July 10, 1978, the Respondent by Order of the Supreme Court of the State of Delaware was publicly censored for similar violations arising from his conduct in a trial in the Alderman's Court of the Town of Newport. The Committee must therefore find that Respondent should be disciplined on a cumulative basis in that his actions reflect a pattern of conduct in violation of DR 1–102 and DR 7–106.[3]

On March 1, 1983, the Board issued the following Final Report recommending that Kennedy be disciplined for his failure to respond to subpoenas issued and interrogatories directed to him by the Board in eleven (11) proceedings pending before the Board charging Kennedy with professional misconduct.

(No. 75, 1983)

1. The following constitutes the Board's findings of fact:

The Respondent was served subpoenas and interrogatories pursuant to Rules 8 and 13 of the Rules of the Board of Professional Responsibility[4] upon matters under preliminary investigation as follows:

| Case No. 795 | Sadie M. Smith | Served July 12, 1982 |
| Case No. 806 | Josephine Smith | Served July 12, 1982 |
| Case No. 807 | Louis F. Christo | Served July 8, 1982 |
| Case No. 808 | Ida Warren | Served September 23, 1982 |
| Case No. 810 | Rose Blanchfield | Served September 23, 1982 |
| Case No. 811 | Olga Wright | Served September 23, 1982 |
| Case No. 816 | Andre Brown | Served September 23, 1982 |
| Case No. 817 | Charlotte Dennis | Served September 23, 1982 |
| Case No. 828 | Jack Cullen | Served September 23, 1982 |
| Case No. 829 | Judge Poppiti | Served September 23, 1982 |
| Case No. 836 | Richard Billings | Served September 23, 1982 |

The Respondent agrees that the subpoenas and interrogatories were served upon him at the times specified. There was an understanding between the Respondent's attorney and the Board chairman that requests for discovery be stayed until October 4, 1982. The special prosecutor for the Board agreed to extend the date for furnishing discovery to October 29, 1982.

The Respondent has failed to either respond to the interrogatories or to honor

---

3. The Code of Professional Responsibility provides as follows:

DR 7–106(C)(6)

In appearing in his professional capacity before a tribunal, a lawyer shall not:

\* \* \* \* \* \*

(6) Engage in undignified or discourteous conduct which is degrading to a tribunal. DR1–102(A)(5)

A lawyer shall not:

\* \* \* \* \* \*

(5) Engage in conduct that is prejudicial to the administration of justice.

4. Rule 8 of the Board on Professional Responsibility states that "[t]he Board may require any member of the Bar to answer written interrogatories propounded by it relevant to any matter which is the subject of an investigation or a preliminary or formal hearing."

Rule 13 provides for the issuance of "[s]ubpoenas for the attendance of witnesses and the production of books and records ... "and" may, in the alternative, require the person to whom it is directed to make written answer to written interrogatories to be attached thereto."

the subpoenas at any time subsequent to October 29, 1982. The Respondent has objected from the inception to the discovery on legal grounds. His reasons are set out in his Motion to Dismiss and Petition Requesting an Extension of Time and Requesting Certification of the Constitutionality of DR 1–103(c) and Rules 8 and 13 of the Board of Professional Responsibility.[5] The Respondent asserts he has the information requested in the hands of his attorney pending the outcome of these proceedings.

The Board determined that it is not an appropriate body to resolve the legal contentions asserted by the Respondent as a reason for refusing to comply with discovery under Rules 8 and 13 of the Board of Professional Responsibility. The Board determined that its sole function should be to determine whether Respondent has in fact refused to comply with the Rules of the Board of Professional Responsibility.

The following constitutes the Board's conclusions of law.

The interrogatories propounded to the Respondent requested relevant information to matters under investigation by the Board under Rule 8.

The Respondent failed to respond to subpoenas of the Board on Professional Responsibility in accordance to Rule 13.

The Board recommends that the Respondent be disciplined for his failure to respond to subpoenas issued and to an-

swer interrogatories directed to him by the Board.

## II

The first issue we address is Kennedy's denial that he violated any Disciplinary Rule. In Nos. 60, 204 and 205, Kennedy argues that the findings of fact and conclusions of law are incorrect because they are not supported by the evidence in the record. We are not persuaded that there is any merit to this argument. To the extent creditibility was an issue, the Board resolved it and there is substantial evidence in the record to support the Board's findings and its conclusions of law. Accordingly, we confirm each Report as filed by the Board. See Supreme Court Rule 64. Further, the Board's conclusions of law based on its findings of fact are correct as a matter of law.

## III

We next address Kennedy's contention in support of his appeal which he raises in all four cases that his right to due process has been violated by a commingling of the investigative, prosecutorial and adjudicative roles among the Board members and by the appointment by this Court of a Special Prosecutor. While Kennedy concedes that the Board Rules contain strict safeguards preventing the commingling of these three functions in the same proceeding and they were followed in each case,[6] it is his contention that the Board Rules are unconstitu-

---

5. The Code of Professional Responsibility provides:

DR 1–103(C)

A lawyer under investigation by the Board on Professional Responsibility of the Supreme Court of Delaware shall, upon proper request of the Board on Professional Responsibility or an investigating member or subcommittee of the Board on Professional Responsibility, make available to the Board on Professional Responsibility, its investigating members and subcommittees and their agents all books, records and other documents which may be pertinent to the subject of the investigation and which may not properly be withheld on the ground of privilege.

6. Rule 3 of the Board provides:

All complaints against members of the Bar shall be in writing, shall set out with particularity the essential facts constituting the matter complained of, and shall be filed initially with the Chairman of the Board. In the event a complaint is made orally to any member of the Board, it shall be the duty of such member, or some other member of the Board to be designated by the Chairman for the purpose, to assist the complaining party or party acting on his behalf (hereinafter called the complainant) to put such complaint in writing. The member so assisting the complainant thereafter shall take no part in the

tional because they do not prevent a Board member from presenting the evidence to the Board in one case arising out of one set of facts and sitting as an adjudicator and deciding another matter before the Board involving the same attorney but arising out of entirely separate facts. Specifically, Kennedy argues that he was denied due process of law because the bias which Mr. Tybout acquired against him while investigating and presenting the evidence before the Board at the hearing in No. 205 prevented him from impartially sitting on the panel adjudicating No. 204. Kennedy makes the same argument with regard to Mr. Biondi's investigating and presenting evidence in No. 60 and sitting on the panel adjudicating No. 204. Additionally, Kennedy also argues that this Court's appointment of a Special Prosecutor in No. 75 not only exceeds the authority of the Court and its Rules, but asserts that "[t]he involvement of the Court in a prosecutorial decision is another example of the inherent

taint present where there is a commingling of functions." We find these arguments to be without merit.

■ In *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), the United States Supreme Court rejected a physician's claim that proceedings before the medical examining board to revoke his license denied him due process of law because the same members both investigated and adjudicated the case. In *Withrow v. Larkin,* the Court stated:

The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investiga-

deliberations or decision of the Board with respect to such complaint, but such member shall not be disqualified from being appointed a member of the subcommittee to make a preliminary investigation of the complaint in accordance with Rule 5 nor shall such member be disqualified from being appointed to formulate an order to show cause, to examine witnesses and present evidence of the charge before the Board as provided in Rule 6.

Rule 5 of the Board provides in pertinent part:

The Chairman may refer each complaint or investigation sua sponte to a subcommittee consisting of one or more members of the Board for preliminary investigation. The subcommittee shall investigate such complaint or other matter referred as fully as need be to determine the essential facts of the matter prima facie, and shall submit a report thereof to the Board with appropriate recommendations as to the disposition of the matter. The subcommittee may require the attendance of witnesses and production of documents by subpoenas and interrogatories directed to the lawyer being investigated or other witness. The person to whom the subpoena or interrogatories are directed may, at any time prior to the time stated therein for appearance, production or answer, apply to the full Board on Professional Responsibility

for a protective order, and the Board on Professional Responsibility, for good cause shown, may quash or modify the subpoena or grant protective relief from the interrogatories. Upon receiving the subcommittee's report, the Board shall take such action in respect thereto as the facts and circumstances warrant. No member of the investigating subcommittee shall take part in the deliberations or decision of the Board with respect to such matter but members of the investigating subcommittee shall not be disqualified from being appointed to formulate an order to show cause, to examine witnesses and present evidence of the charge before the Board as proved in Rule 6.

Rule 6 of the Board provides in pertinent part:

In the event the Board decides to hold a hearing in respect to any complaint or other matter brought to its attention, the Chairman of the Board shall appoint one of its members to formulate an order to show cause against the attorney and to examine the witnesses and present all evidence in support of the charges before the Board. Such member so appointed shall take no other part in the deliberations or decision of the Board in respect to such matter.

tive and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

Very similar claims have been squarely rejected in prior decisions of this Court. *Id.* at 47, 95 S.Ct. at 1464.

In Nos. 204, 205 and 60, Kennedy has presented no evidence to overcome this presumption of honesty and integrity other than to say conclusively that the participation of a Board member who acts in an adjudicative or investigative role in one proceeding and in a judicial role in another proceeding involving different facts is a violation of due process. In effect, Kennedy asks this Court to hold that it is a *per se* violation of due process for the Board to combine its investigative and adjudicative functions where the combination does not occur in the same proceeding but in different proceedings. This has never been the law, and we decline to adopt this approach. *See Withrow v. Larkin Id; Schweiker v. McClure,* 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982); *Doraiswamy v. Secretary of Labor,* 555 F.2d 832 (D.C.Cir.1976).

Kennedy's attempt to distinguish *Withrow v. Larkin* on the ground that it allows the commingling of "investigative" and "adjudicative" roles but not "prosecutorial" and "adjudicative" is without merit in that the Board members act not as prosecutors but as investigators. Under Board Rule 5 the Board by subcommittee conducts a preliminary investigation to determine whether a rule to show cause should issue. If the

Board determines that a rule to show cause should issue, a formal private hearing is held at which the Board member charged with investigating the complaint presents his findings. At that time, the respondent is given notice and a reasonable opportunity to present such matters as he may choose; at the formal hearing an opportunity to present evidence and cross examine witnesses is afforded. Rule 7. To quote the Supreme Court of Missouri:

We are unable to conclude that this constitutes a prosecution as respondent contends even though the commission asks questions of the witnesses. Although an investigator is allowed to ask questions of witnesses, it does not necessarily make him a prosecutor. Using respondent's logic, we would have to conclude that every time a trial judge asked a witness a question to clarify a matter he would become a prosecutor.

*Matter of Duncan,* Mo.Supr., 541 S.W.2d 564, 568 (1976). In that the Board followed its rules and procedure and that no evidence has been offered rebutting the presumption of honesty and integrity, Kennedy's first argument must fall.

As to Kennedy's second contention concerning the appointment by this Court of a Special Prosecutor in No. 75 to handle a large volume of complaints against Kennedy, there is no merit to the argument that this Court exceeded its authority or became "tainted" in the adjudicative process in that the Special Prosecutor exercised no other function than that performed by an Associate Member of Board similarly appointed.[7] The fact that the Special Prosecutor carried

---

**7.** Walter S. Rowland, Esq., who was neither a Member nor an Associate Member of the Board during the investigation of any of the complaints against Kennedy, was appointed by this Court to serve as a "Special Prosecutor" for two reasons: One, to handle and coordinate the unusually large number of complaints against Kennedy, and two, to allay the grievances asserted by Kennedy in other cases regarding the commingling of "investigative" and "adjudicative" functions of Board Members assigned to

individual complaints. Rowland's subsequent appointment to the Board as an Associate Member by Order of this Court dated July 8, 1983 has no further bearing in this regard to complaints against Kennedy or any other Respondent since amended Board Rules 5 and 6, effective June 8, 1983, permits Associate Members to only investigate complaints and present their findings to the Board who alone decides or adjudicates as to the merits of the complaint.

a different title has no legal significance. Moreover, Kennedy's failure to object at the hearing to the subpoenas and interrogatories served on him by the Special Prosecutor requires a showing of prejudice suffered by him in order for his argument to succeed. Having failed to make such a showing, Kennedy was neither denied equal protection nor due process of law.

### IV

Kennedy's next contention, raised in Nos. 60, 204 and 205, is that his due process rights have been violated in that hearsay evidence but not the results of a polygraph examination was admitted by the Board pursuant to Board Rule 9. We find this argument to be without merit.

■ The Board is an agency of this Court, and its proceedings can be properly classified as administrative in nature. The Board's Rule 9 provides:

All witnesses shall be sworn in all proceedings hereunder. The rules of evidence applicable to the Superior Court of the State of Delaware shall be followed as far as practicable, provided that evidence may be admitted and considered which possesses probative value commonly accepted by reasonably prudent men in the conduct of their affairs.

Where the respondent is or has been a party to a proceeding, whether criminal, civil, administrative or otherwise, the relevant portions of the transcript of the proceedings, exhibits, findings of fact, conclusions of law, opinions, decisions and judgments, shall be admitted in evidence, and shall be accorded such weight as the Board shall deem appropriate; provided, however, that proof of a conviction of the respondent for any crime shall be conclusive evidence of the commission of that crime.

Rule 9, which was approved by this Court, by its terms allows evidence to be admitted which is hearsay so long as it "possesses probative value commonly accepted by reasonably prudent men in the conduct of their appeal". The Due Process clause has never been read to mean that the admission of hearsay evidence in an administrative type proceeding is a violation of that clause, and we decline to accept that reading today. *See Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Schaefer v. United States*, 633 F.2d 945, 952 (Ct.Cl.1980); *Smith v. Edmiston*, 431 F.Supp. 941, 946 (W.D.Tenn.1977). Moreover, even if the strict rules of evidence should have been followed, reversal would not be warranted notwithstanding the hearsay because we find sufficient competent evidence with probative value in the record to support the Board's decision. *Geegan v. Unemployment Compensation Commission*, Del.Supr., 76 A.2d 116 (1950).

As to Kennedy's contention in No. 60 that "the Board erred since it did not uniformly apply the lesser evidentiary standard" in admitting hearsay evidence while denying his request that the witnesses submit to polygraph examinations and the results of which be admitted into evidence, we fail to find that a "double standard" has been applied. First, the Board never attempted to admit the results of a polygraph examination against Kennedy. Second, the Board committed no error by denying Kennedy's request in that this Court has recognized that "[p]olygraph examinations are generally held inadmissible for any purpose because their scientific reliability has not been established." *Foraker v. State*, Del.Supr., 394 A.2d 208 (1978). Since it has been shown that the admissibility of hearsay evidence and denial of polygraph results does not create a double standard, Kennedy was not denied due process of law.

### V

We now turn to Kennedy's arguments raised in Nos. 205 and 75 that Disciplinary

Rule 2–106 is unconstitutionally vague and that the vagueness of the discovery provisions of the Rules denied him due process.

▋ The United States Supreme Court has recently articulated the task a court must perform in dealing with a facial challenge based on the vagueness of a law. In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 1191, 1193, 71 L.Ed.2d 362 (1982), the United States Supreme Court stated:

> In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications. A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law. (footnotes omitted)

\* \* \* \* \* \*

A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process. To succeed, however, the complainant must demonstrate that the law is impermissibly vague in all of its applications.

In that the challenged law does not interfere with constitutionally protected conduct, *See Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), the analysis outlined in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* is applicable. Applying this analysis to the instant case, Kennedy cannot be heard to complain that DR2–106 is vague in that his conduct in the instant case is clearly proscribed by the Disciplinary Rule.

Disciplinary Rule 2–106(A) provides:

"A lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee."

The rule then provides a guideline for determining an excessive fee in subsection (B) which provides:

"A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

"(1) The time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal services properly.

"(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will include other employment by the lawyer.

"(3) The fee customarily charged in the locality for similar legal services.

"(4) The amount involved and the results obtained.

"(5) The time limitations imposed by the client or by the circumstances.

"(6) The nature and length of the professional relationship with the client.

"(7) The experience, reputation and ability of the lawyer or lawyers performing the services.

"(8) Whether the fee is fixed or contingent."

In its report, the Board applied these factors and found among other things that: (1) no substantial amount of time or legal effort was entailed; (2) the representation of Mr. Book did not preclude Kennedy from

accepting other employment; (3) the 50% contingent fee in this type of case was substantially in excess of the fee customarily charged in this state; (4) Kennedy achieved no significant results as a result of his representation of Mr. Book; (5) there were no time limitations imposed; (6) there was no other professional relationship between Kennedy and Mr. Book; and (7) Kennedy's experience, reputation, and ability were not factors in calculating the fee since there was really no legal effort involved in obtaining the benefits. Given our conclusion that these findings are supported by sufficient evidence in the record, we find that this fee arrangement is clearly the kind of arrangement proscribed by DR2–106, and as such the rule is not impermissibly vague in all of its applications.

As to the vagueness of the discovery rules, Kennedy contends that since there are no specific provisions for reciprocal discovery rights under Rules 8 and 13 of the Board, those discovery rules are unconstitutional under the Due Process Clause of the United States Constitution. This argument, however, fails to recognize that other Rules of the Board are specifically tailored to afford a respondent discovery rights and protection. For instance, Rule 11 provides that:

> [a]ny person complained against shall have the right to defend against the charge by the introduction of evidence and the right to be represented by counsel and to examine and cross-examine witnesses. He shall also have the right to the issuance of subpoenas for the attendance of witnesses to appear and testify or for the production of books and records.

Similarly, Rule 10 gives a respondent the right to seek an appropriate order to compel "the testimony of a witness residing outside the State by deposition or otherwise". Furthermore, a respondent under Rule 5 may apply "to the full Board ... for a protective order and the Board ..., for good cause shown, may quash or modify the sub-

poena or grant protective relief from the interrogatories". Therefore, we find no merit to Kennedy's argument that the discovery provisions of the Board are one-sided in violation of his right to due process.

## VI

We turn now to Kennedy's contention in No. 60, 1983 that the Board's refusal to continue the case denied his right to counsel, his right to confront witnesses and consequently, his right to a fair trial.

██ At the outset, we note that a discretionary ruling by a trial court or administrative body on a motion for a continuance will not be set aside unless that decision is unreasonable or capricious. *Raymond Heartless, Inc. v. State,* Del.Supr., 401 A.2d 921 (1979); *Blackledge v. Com. Pennsylvania State Police,* 62 Pa.Cmwlth. 188, 435 A.2d 309 (1981). Turning to the facts surrounding the request for a continuance, we see that the continuance was requested because of scheduling conflicts of Kennedy's attorney. We note, however, that Kennedy had notice of the possible charges against him approximately six months before the hearing was actually scheduled, and no request for a continuance was made within one month of having received notice that the hearing date had been set. In addition, we find that the alleged scheduling conflicts of Kennedy's lawyer arose after the hearing date was set. Therefore, absent constitutional infirmities, the Board did not abuse its discretion in denying the continuance.

██ Kennedy's argument that the Board's determination denied him his constitutional right to counsel is without merit. The right to counsel does not mean an absolute right to particular counsel of one's choice. For instance, in *Hodge v. Hodge,* 507 F.2d 87 (3rd Cir.1974), the Third Circuit Court of Appeals held that:

> [t]he refusal to grant a continuance is not, without more, a denial of the right to

counsel even though the refusal prevents a party from being represented by a particular attorney because of that attorney's other professional commitments. [cites].

\* \* \* \* \* \*

The rule in this circuit ... is that 'although the right to counsel is absolute, there is no absolute right to a particular counsel. Id at 90.

Since Kennedy had two weeks' notice that his request for a continuance had been denied, we find he had ample opportunity to obtain other counsel. In addition, due to our determination that the facts and issues in the case were relatively uncomplicated and at the same time not novel, or requiring particular expertise, we find that substitute counsel could reasonably prepare for the hearing in the two week period.

As to Kennedy's claim that he was denied the right to confront witnesses against him, a ruling in his favor would ignore the fact that he chose to leave the hearing voluntarily even in the face of a subpoena commanding him to appear and testify. Overall, we cannot find a violation of Kennedy's right to a fair trial when Kennedy elected to neither obtain counsel nor confront witnesses by his decision to leave the hearing.

## VII

Kennedy's final two allegations, arising in reference to No. 75, argue that he was denied due process of law since he was never notified he was being charged with a disciplinary violation and the discipline recommended by the Board was unwarranted because he relied upon the advice of counsel in an alleged good faith challenge to the discovery rules. We find that neither contention has merit.

First, we note that the subpoenas served on Kennedy stated that a failure to respond might constitute contempt of this Court. In addition, the Final Report in regard to this matter recommended discipline for a

finding of contempt of this Court in failing to answer subpoenas and interrogatories not a recommendation for discipline based upon a finding of a disciplinary violation under the Code of Professional Responsibility. Therefore, Kennedy's first argument must fall.

█ Second, Kennedy's contention that he acted in good faith reliance on the advice of his attorney in not responding to interrogatories and depositions is not supported by the record. Unlike the situation in *In re Kennedy,* Del.Supr., 442 A.2d 79 (1981), where this Court upheld Kennedy's good faith challenge to production of records involving the Clients' Security Trust Fund, Kennedy completely ignored Rule 5 which was pertinent to this case and never sought a protective order from the full Board anytime during the five-month period between July 9, 1982, when he was served the earliest set of subpoenas and interrogatories in this matter, and December 8, 1982, when the hearing took place. Rather, he attempted to raise constitutional challenges to the discovery provision by petitioning this Court for a continuance on December 1, 1982 and upon denial of his request, raising them before the Board at the December 8, 1982 hearing. Based upon Kennedy's failure to adhere to the Rules as set forth by this Court, we find that he is barred from alleging a good faith argument in support of his position.

## VIII

Having affirmed the findings of the Board, this Court must now turn its attention to what disciplinary action, if any, must be taken to protect the public and uphold the integrity of the Bar. Generally, measures imposed for professional misconduct include private reprimand, public reprimand, suspension, and disbarment. Several factors, however, must be considered whenever the Court undertakes this task.

First, the fact that the Board issued final reports in all the matters presently before

the Court indicates that the Board was either expressly or impliedly of the opinion that more than a private censure was required. See Supreme Court Rule 63(d)(i). Second, "any [prior] discipline or admonition of a respondent by the Court or the Board may be considered . . . in determining the appropriateness of any discipline, or the form of any discipline, in subsequent cases against the defendant." Supreme Court Rule 63(d)(iii). In other words, this Court must review Kennedy's entire history since that time when he became a member of this Bar in 1974 in order to determine what effect, if any, prior disciplinary measures against Kennedy have on today's ruling. Third, since the Court in its discretion can impose such disciplinary measures as it deems appropriate, it is necessary to consider any mitigating as well as aggravating circumstances going to the type and severity of the violations committed.

Turning to the violations themselves, we note that Kennedy's behavior as a member of this Bar has fallen short of its duty in the following ways.[8] First, in No. 60, Kennedy has failed to assist in maintaining the integrity and competence of the legal profession by conduct, which to say the least, was prejudicial to the effective administration of justice. Second, Kennedy by not taking reasonable steps to avoid prejudice to his client's rights upon withdrawal from employment in No. 204 and by charging excessive fees in No. 205 has failed to assist the legal profession in fulfilling its duty to make legal counsel available. Third, Kennedy in No. 204 has failed to represent his client competently by neglecting to file an affidavit of dependency as required by 13 Del.C. § 1512(a). Fourth, and not least, Kennedy has demonstrated on multiple occasions that he does not adhere to the concept of representing a client zealously with-

in the bounds of the law. In No. 204, Kennedy failed to seek the lawful objective of the client and, at the same time, failed to carry out his attorney/client employment contract. Also, in No. 60, he exhibited conduct which can only be described as discourteous and degrading to the tribunal.

Kennedy's failure in the matters presently before the Court to promote the concepts set forth in the select Canons of the Code of Professional Responsibility, described above, is further aggravated by the fact that this Court by Order dated July 10, 1978 publicly censured Kennedy for violation of the same concepts, violations of the same DR's, and a host of other DR's reflecting those same concepts.[9] Such being the case, this Court is highly concerned that the attitude of Kennedy, as reflected by what we deem an unheard of pattern of behavior by a member of this bar, has reached a point where drastic action must be taken regarding his fitness to practice law. In addition, the Court weighs heavily against Kennedy his contemptuous attitude in reference to an arm of this Court, namely the Board on Professional Responsibility, in his action in No. 75 regarding his lack of cooperation in the investigation into various complaints against him in that he failed to respond to subpoenas issued and interrogatories directed to him by the Board in eleven (11) proceedings charging him with misconduct.

Before turning to the imposition of the discipline, however, it is necessary in regard to No. 75 that we distinguish between the purpose of the disciplinary process and the invocation of the contempt power of the Courts which uniformly is directed to acts which threaten to obstruct justice, threaten to obstruct the carrying out of court orders, or threaten to bring a court into disrepute. Disciplinary processes, on the other hand, although they may overlap contempt sanc-

---

**8.** The Court in attempting to classify Kennedy's actions finds it suitable to rely on the general concepts of the Code of Professional Responsibility set out in those Canons reflecting the

Disciplinary Rules (DR's) violated, which unlike the Canons are mandatory in nature.

**9.** See Appendix A.

tions to some degree, are designed to focus on the protection of the public from lawyers whose conduct falls below that prescribed by the Code of Professional Responsibility Standard 1.1 of the A.B.A. Standards for Lawyer Discipline and Disability Proceedings (February 1979), which provides:

*1.1 Purpose of Lawyer Discipline and Disability Proceedings.*

The purpose of lawyer discipline and disability proceedings is to maintain appropriate standards of professional conduct in order to protect the public and the administration of justice from lawyers who have demonstrated by their conduct that they are unable or are likely to be unable to properly discharge their professional duties.

COMMENTARY.

... Disciplinary procedures are not lawsuits between parties litigant but rather are in the nature of an inquest or inquiry as to the conduct of the respondent. They are not for the purpose of punishment, but rather seek to determine the fitness of an officer of the court to continue in that capacity and to protect the courts and the public from the official ministration of persons unfit to practice. Thus the real question at issue in a disbarment proceeding is the public interest and the attorney's right to continue to practice a profession imbued with public trust. *In re Echeles,* 430 F.2d 347, 349 (7th Cir.1970).

Thus, while some instances of Kennedy's misconduct do not involve contempt of court, e.g., excessive fee charging, it is difficult to conclude that those instances which involve contemptuous acts do not call into question the fitness of Kennedy to practice law. Therefore, we weigh them equally along with the other types regardless of the contempt sanctions (or lack thereof) already imposed.

IX

■ We now turn to the imposition of the discipline itself. Fully aware of the wide range of discipline available and finding no mitigating circumstances which affect the nature or degree of the discipline imposed, we hereby suspend John B. Kennedy for a period of two years, effective immediately. We further hold that during the period of suspension, Kennedy shall not (a) engage in any activity whatsoever as a member of the Delaware Bar; (b) share in any fees collected, billed, or earned by any other attorney for legal services rendered by such attorney; (c) resort to the use of professional stationary, even for personal correspondence; (d) maintain any telephone listing as an attorney; (e) advertise in any medium the ability to practice law; (f) maintain or occupy any office designated as a law office; and that, without limiting the foregoing, the latter restriction specifically requires Kennedy to (1) remove immediately from any premises any sign bearing his name as an attorney and (2) remove immediately from any premises maintained or occupied by him any sign indicating usage as a law office.

Furthermore, within thirty (30) days of today's date, Kennedy shall notify or cause to be notified by registered or certified mail, return receipt requested; (a) all clients being represented in pending matters; (b) any and all co-counsel in pending matters; (c) any opposing attorney in pending matters, or in the absence of such attorney, the adverse parties; (d) all persons or their agents or guardians to whom a fiduciary duty is or may be owed at any time after today's date; and (e) all other persons with whom Kennedy may at any time expect to have professional contacts under circumstances where there is a reasonable probability that they may infer that Kennedy continues as an attorney in good standing. The required notice shall advise of this Court's ruling and that Kennedy is disqualified to act as a lawyer after today's date. The notice to be given to opposing attorneys or the adverse party shall state the place of residence of Kennedy.

It is further ordered that within thirty (30) days, Kennedy shall deliver to all

clients being represented in pending matters any papers or other property to which the client is entitled and shall notify them or any counsel representing them of a suitable time and place, calling attention to any urgency for obtaining the papers or other property. In addition, within the said thirty (30) day period, Kennedy shall refund any part of any fees paid by a client in advance which have not been earned to date.

In the event a client does not obtain another lawyer within the first twenty (20) days of the above-mentioned thirty (30) day period, it shall be the responsibility of Kennedy within the remaining ten (10) days of the thirty (30) day period to move the court or agency in which the client's matter is pending for leave to withdraw. If such is the situation, Kennedy shall file with the court or agency before which the litigation is pending a copy of the notice to opposing counsel or adverse parties.

At a time on or before the completion of the thirty (30) day period, Kennedy shall file with this Court an affidavit showing (a) his full compliance with the provisions set forth above; (b) a list of all other state, federal and administrative jurisdictions to which he is admitted to practice; and (c), his residence or other addresses to which communications thereafter may be directed.

In the event that Kennedy fails to comply with the conditions set forth regarding the thirty (30) day period or upon evidence that he has failed to continue complying with any other conditions of his suspension, this Court upon proper proof shall appoint a receiver with such powers as this Court shall direct.

At the expiration of the full two year suspension, Kennedy may apply to the Board for reinstatement. At that time, the burden is on Kennedy to demonstrate proof of rehabilitation sufficient to overcome his present inabilities to practice. Upon such proof, this Court will order reinstatement.

The suspension imposed today in no way affects any other matter pending before the Board, and the findings of the Board in regard to those matters shall be considered on a cumulative basis in determining any reinstatement petition along with Kennedy's compliance with today's mandates. Therefore, the Board is hereby directed to continue to investigate matters presently before it, and any others arising out of representations of Kennedy prior to today, so that they can be considered either for purposes of determining whether further sanctions are appropriate, or in the event Kennedy seeks reinstatement under the provisions set forth above upon the expiration of the two year period which commences this 24th day of January, 1984.

## APPENDIX A.

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| In Re: | § | |
|---|---|---|
| | § | No. 98, 1976 |
| JOHN B. KENNEDY, a Member | § | |
| of the Bar of the Supreme | § | Submitted: May 10, 1978 |
| Court of the State of | § | Decided: July 10, 1978 |
| Delaware | § | |

### ORDER

This 10th day of July, 1978,

It Appearing to the Court:

I. That the Censor Committee of this Court has filed herein a Final Report in the above captioned matter, dated April 14, 1976, as follows:

"The Censor Committee finds disciplinary action to be warranted upon various charges advanced and heard by the Committee in hearings held July 24, 1975, September 8, 1975, and March 3, 1976. The findings of fact and conclusions of law with respect thereto are set forth in this report by charge.

### "COUNT ONE

"*Findings of Fact:*

"1. One Gene Wills appeared before Alderman Joseph A. Palermo of the Town of Newport charged with a traffic violation. He was unrepresented at the

time. After conducting a hearing on July 16, 1974, Alderman Palermo adjudged Gene Wills guilty of going through a red light. He advised Mr. Wills of his right to file an appeal by posting a $500 bond. A fine of $10, plus costs, was paid by Mr. Wills on August 23, 1974.

"2. The Respondent was later consulted by Mr. Wills concerning the traffic violation. Thereafter, the Respondent addressed a letter to Alderman Palermo requesting a new trial on behalf of Mr. Wills.

"3. Under date of August 5, 1974, Alderman Palermo sent a letter to the Respondent, denying his request for a new trial.

"4. On August 6, 1974, the Respondent addressed a second letter to Alderman Palermo demanding an evidentiary hearing, and that a date for a new trial be set. On August 8, 1974, Alderman Palermo sent a second letter to the Respondent, denying his request for a new trial.

"5. On August 23, 1974, the Respondent forwarded a third letter to Alderman Palermo, rearguing his demand for a new trial and an evidentiary hearing. His letter concluded with the following language:

"'It is expected that you will give this your immediate and undivided attention.'

"6. Under date of September 18, 1974, the Respondent addressed a letter to John Hanna, Mayor of the Town of Newport, referring to the above traffic violation charge against Mr. Wills, and in the letter used the following language:

"'Mr. Palermo decided that it was not in his best interests to afford my client his Constitutional right to have an evidentiary hearing as concerns this procedure step.'

"7. In his letter of September 18, 1974, the Respondent also stated that he had referred the matter to the Superior Court for adjudication, which statement in fact was untrue.

*"Conclusions of Law:*

"8. The Respondent has violated DR7–106(C)(6) by using language in his letter of August 23, 1974, addressed to Alderman Palermo, which was undignified and discourteous and which tended to discredit a judicial tribunal.

"9. The Respondent has violated DR8–102(B) by knowingly making a false accusation against Alderman Palermo in his letter to Mayor Hanna of the Town of Newport.

"10. The Respondent has violated DR7–102(A)(5) in that he knowingly made a false statement of fact when he stated that he had referred the matter to the Superior Court for adjudication.

"11. The Respondent has violated DR1–102(A)(5) and (6) in that he engaged in conduct that was prejudicial to the administration of justice and adversely reflected on his fitness to practice law.

"COUNT TWO

*"Findings of Fact:*

"1. Richard Henry Robinson had been indicted in 1974 on various charges by a federal Grand Jury and by the Grand Jury of the State of Delaware.

"2. The ex-wife of Mr. Robinson (hereinafter 'Mrs. Robinson') had attempted to post bond on the state charges and was advised by an official in the Prothonotary's Office that a lien search would be necessary. She requested the assistance of the Respondent and he charged her and was paid the sum of $125 for performing a lien search.

"3. Thereafter, in connection with the federal charges, Mr. Robinson was sent to a federal institution in Missouri for a mental evaluation, the duration of the evaluation to be approximately sixty days.

"4. Mrs. Robinson made numerous telephone calls to the Respondent concerning the failure of Mr. Robinson to be returned to Delaware by the federal authorities after the sixty-day evaluation period had elapsed, and she retained the Respondent to accomplish the return and release of Mr. Robinson.

"5. Frances O. Robinson made a payment of $200 on July 26, 1974 to the Respondent and a further payment of $300 on September 13, 1974 for services to be rendered by him.

"6. On September 4, 1974, Mr. Robinson had personally filed a petition for a writ of habeas corpus in Missouri. The Respondent did not participate in the preparation of this petition in any manner, or consult with Mr. Robinson in connection therewith.

"7. On September 23, 1974, a United States Magistrate in Missouri filed a written opinion, recommending that Mr. Robinson be returned to Delaware.

"8. On September 4, 1974, Judge Murray Schwartz of the United States District Court for the District of Delaware signed an order granting Mr. Robinson leave to proceed on his motion to vacate the federal indictment.

"9. On September 10, 1974, the Respondent filed a habeas corpus petition on behalf of Mr. Robinson, in the Delaware United States District Court, and apparently was unaware of the habeas corpus petition filed by Mr. Robinson previously in Missouri on September 4, 1974.

"10. The Respondent did not learn of the Missouri United States District Court order until on or about October 1, 1974.

"11. Mr. Robinson was returned to Delaware as a result of his own personal efforts and the habeas corpus petition filed by the Respondent was in no way related to his return to Delaware.

"12. No representation was actually necessary on behalf of Mr. Robinson, in light of the successful habeas corpus petition which he filed in Missouri. The Respondent could have learned of this before he proceeded in the Delaware case.

"13. On or about April 8, 1975, after Mr. and Mrs. Robinson filed their complaint with the Censor Committee in this matter, the Respondent notified Mrs. Robinson that she was indebted to him in the amount of $480 for approximately 45 telephone calls covering the period from June 30, 1974 through July 25, 1974, a period prior to the time he submitted statements for services to Mrs. Robinson, which statements made no mention of telephone calls.

"14. The Respondent violated no disciplinary rule in charging for performance of a lien search or in performing said search.

"15. The Respondent violated DR2–106(A) and (B) in collecting a fee of $500 for filing a writ of habeas corpus for Richard Henry Robinson when, in fact, Mr. Robinson had previously filed such an action on his own behalf. The Respondent should have known, or should have attempted to learn, of the existence of all of the facts prior to filing a petition for habeas corpus in the United States District Court of Delaware.

"16. The Respondent further violated DR2–106(A) and (B) in that he made a charge for telephone calls which was clearly excessive.

"17. The Respondent violated DR1–102(A)(4) and (6) in his financial dealings with Mrs. Robinson.

"COUNT THREE

"*Findings of Fact:*

"1. In the case of McCoy v. Janicki and Salerno, Case No. 74–1403 (C.A. 3, 1975), the Respondent represented appellant McCoy. The appeal was from the denial of a writ of habeas corpus. By the original schedule, the Respondent was to file his opening brief on or before June 5,

 1974. After one extension, and then after the United States Attorney brought the matter to the attention of the United States Court of Appeals by motion to dismiss, the Respondent filed the opening brief on August 23, 1974. In its order of September 10, 1974, denying the motion of the appellee to dismiss, the United States Court of Appeals added the following remarks:

"'The foregoing Motion is denied, with great reluctance, the Court not being impressed by the insubstantial reasons offered to excuse the dereliction of appellant's counsel. Appellant's counsel is admonished that sanctions will be imposed for any future failure to comply with the rules of court.'

"*Conclusions of Law:*

"2. In his delay on this matter the Respondent violated DR6–101(A)(3) and DR1–102(A)(5) and (6).

### "COUNT FOUR

"*Findings of Fact:*

"1. In the case of State of Delaware v. Isijola, Criminal Action No. 266, 1974, in the Superior Court of the State of Delaware in and for New Castle County, the Respondent represented defendant Isijola. In a letter to Mr. Isijola under date of June 17, 1974, the Respondent made improper threats to his client to extract a fee. Respondent stated in the letter that he was 'through playing games' with his client, and that if $300 in fees was not paid within three days, the Respondent would seek to withdraw 'plus have your case continued for an extended indefinite period of time'. In a subsequent letter to Mr. Isijola, under date of July 8, 1974, he conveyed similar improper threats in an effort to collect a fee. Respondent then stated that 'your sentencing will be delayed indefinitely as a consequence of your intransigence' concerning the fee.

"*Conclusions of Law:*

"2. In the aforesaid conduct, the Respondent violated DR7–101(A)(2) and (3) and DR1–102(A)(4) and (6).

### "COUNT FIVE

"*Findings of Fact:*

"1. In the case of State of Delaware v. James Heverin, Jr., Criminal Action No. 1160, 1974, in the Superior Court of the State of Delaware in and for New Castle County, the Respondent represented defendant Heverin.

"2. In a letter of October 31, 1974, to Mr. James Heverin, Sr., the Respondent made improper threats to extract a fee. The Respondent there stated that unless he was in receipt of $1,350 within five days thereafter, he would not appear at the trial of the case, then scheduled for thirteen days thereafter. The Respondent stated that 'should you decide not to acquiesce in this matter, you will be forced to seek other counsel who knows nothing of the fact situation of this case and who I feel would be unprepared to try this matter which has been scheduled one week from November 4'.

"3. In his representation in State v. Heverin, the Respondent violated his contract with Mr. Heverin, Sr., by demanding the additional sum ($1,350) when the original fee arrangement had been that he would defend the matter through trial for $1,000 and that amount had been paid.

"*Conclusions of Law:*

"4. In the aforesaid conduct, the Respondent violated DR7–101(A)(2) and (3) and DR1–102(A)(4) and (6).

### "COUNT SIX

"*Findings of Fact:*

"1. In the case of State of Delaware v. Robert Glenn Johnson, Criminal Action No. 1115, 1974, in the Superior Court of

the State of Delaware in and for New Castle County, the Respondent represented defendant Johnson. During the course of the trial in that case, held October 22 and 23, 1974, the Respondent continually expressed to the jury his personal belief in his client's innocence, over repeated warnings by The Honorable Bernard Balick, the presiding judge.

"*Conclusions of Law:*

"2. In this conduct the Respondent violated DR7–106(C)(3), (4) and (7) and DR1–102(A)(5) and (6).

### "COUNT SEVEN

"*Findings of Fact:*

"1. On or about January 8, 1976, in the case of Robinson v. Kennedy, JP15–75–C1288, the Respondent filed a counterclaim demanding recovery in an amount exceeding the jurisdictional limit of the Court; seeking punitive damages; and seeking injunctive relief in the nature of a commitment of the plaintiff to a mental hospital. The Respondent was aware of the limits of the jurisdiction of the court and knew that each of the prayers for relief apart from monetary damages was beyond the jurisdictional power of the Court. The counterclaims were intended to intimidate the plaintiff, his former client.

"*Conclusions of Law:*

"2. In the aforesaid conduct, the Respondent violated DR7–102(A)(1) and (2) and DR1–102(A)(5) and (6).

### "COUNT EIGHT

"*Findings of Fact:*

"1. In Censor Committee Case No. 341, the Respondent received a private censure from the Censor Committee under date of December 5, 1974, for a violation of DR2–103(A) and was specifically admonished that the censure could be considered on a cumulative basis if fur-

ther, future violations occurred. A further violation did later occur, to wit, the conduct set forth in Count Seven, supra, occurring on or about January 8, 1976.

"*Conclusions of Law:*

"2. The Respondent should be disciplined on a cumulative basis, because of a pattern of conduct in violation of DR1–102(A)(4), (5) and (6).

### "COUNT NINE

"*Findings of Fact:*

"1. The Committee has found that the Respondent committed numerous disciplinary violations, set forth and itemized in the preceding eight counts.

"*Conclusions of Law:*

"2. By virtue of the aforesaid acts, the Respondent has engaged in an overall pattern of conduct in violation of DR1–102(A)(4), (5) and (6)."

II. That the Respondent filed Exceptions to the foregoing Report of the Censor Committee, which said Exceptions were briefed and argued to this Court upon the following grounds:

"(1) The Committee failed to produce any evidence let alone clear and convincing evidence as relevant to alleged misconduct which is charged in Count VIII.

"(2) The Committee failed to prove any alleged acts of misconduct by the Respondent as reflected in its conclusions of law which appear in Count I of the April 14, 1976 Final Report.

"(3) The Committee failed to prove any alleged acts of misconduct by the Respondent as reflected in it's conclusions of law which appear in Count II of the April 14 Final Report.

"(4) The Committee's 'Findings of Fact and Conclusions of Law' were rendered a nullity since it denied the Respondent the right to due process and a fair hearing by violating the Rules of the

Supreme Court and the Rules of the Censor Committee during a hearing on March 3, 1976."

III. That upon due consideration of the Respondent's Exceptions and the briefs and arguments of counsel, there is no merit in the Respondent's Exceptions or the arguments in support thereof, and that the Censor Committee's Final Report and recommendation of disciplinary action against the Respondent should be approved;

IV. That, however, the degree of disciplinary action to be taken by this Court should be determined in the light of these facts and circumstances:

(1) All offenses charged against the Respondent occurred in the years 1974 and 1975, the Respondent having entered the private practice of law in 1974; and

(2) These proceedings have been pending in this Court for over two years, a grossly undue length of time, explainable only by the physical incapacity of the Respondent resulting from a motor vehicle accident and by an unacceptable delay in bringing this matter to issue for decision by this Court, for which all counsel in the case must bear accountability;

NOW, THEREFORE, IT IS ORDERED:

(1) That the Final Report of the Censor Committee filed herein be and it is hereby approved; and

(2) That, as sanction for the violations of the Delaware Lawyer's Code of Professional Responsibility therein set forth, the respondent John B. Kennedy be and he hereby is PUBLICLY CENSURED; and

(3) That copy hereof be transmitted by the Clerk to the Chief Judge of each State Court and to the Prothonotary and Register in Chancery of each County.