IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

BON AYRE COMMUNITY   :
ASSOCIATION, INC.,   :   C.A. No. K15A-05-002 WLW
  :   in and for Kent County
  Appellant,   :
  :
  v.   :
  :
BON AYRE LAND, LLC,   :
  :
  Appellee.   :


Submitted: October 1, 2015
Decided: January 12, 2016

**OPINION AND ORDER**

Upon an Appeal from the Decision of the Arbitrator;
Superior Court's Decision on Appellee's
Request for a Rent Increase Above the CPI-U.
*Denied.*


James G. McGiffin, Jr., Esquire of Community Legal Aid Society, Inc., Dover, Delaware; attorney for Appellant.

L. Vincent Ramunno, Esquire of Ramunno & Ramunno, P.A., Wilmington, Delaware; attorney for Appellee.


WITHAM, R.J.

Appellant Bon Ayre Community Association, Inc. ("BACA") appeals the non-binding decision of the Arbitrator to allow an increase in lot rent in the Bon Ayre manufactured home community in excess of the Consumer Price Index for All Urban Consumers in the Philadelphia-Wilmington-Atlantic City area ("CPI-U"). The issue before the Court is whether Appellee Bon Ayre Land LLC ("Bon Ayre") complied with the provisions of the title 25, section 7042 of the Delaware Code when raising rent in excess of the CPI-U.

BACA raises two issues on appeal. BACA's first claim is that Bon Ayre's requested rent increase was not justified because the record contained no evidence that the requested increase was directly related to operating, maintaining, or improving the community as required by the 25 *Del. C.* § 7042. BACA argues that failure to meet this element precludes Bon Ayre from justifying a rent increase in excess of the CPI-U based on any of the criteria listed in subsection (c). Bon Ayre claims an interpretation that allows market rent as a stand alone justification for rent increase, and further argues that any other interpretation would be inconsistent with legislative intent and redundant. BACA's second claim is that Bon Ayre's requested rent increase was not justified because the record does not contain enough sufficient, reliable, or competent evidence to justify a rent increase under the market rent factor. In response, Bon Ayre supports the Arbitrator's findings and further claims the statute is ambiguous, vague, and unworkable, and therefore unconstitutional. For the following reasons, this Court finds a rent increase above the CPI-U has not been justified under the provisions of 25 *Del. C.* § 7042. This Court further finds the statute is not ambiguous, vague, or unworkable, and Bon Ayre's challenge to the

2

statute's constitutionality is therefore without merit.

## I. FACTS AND PROCEDURAL BACKGROUND

Bon Ayre is a community of manufactured homes located in Smyrna, Delaware. Residency in the community is limited, with some exceptions, to individuals who are fifty-five years of age or older. The residents own their homes and pay rent to Bon Ayre for the lot upon which the home sits. Many of the home owners are members of BACA, a corporation organized to represent the interests of the home owners.

The catalyst for the current action was the notice of a proposed increase in rent sent to three home owners in December 2014 and to one home owner in January 2015. The CPI-U for the thirty-six months preceding the proposed rent increase was 1.6%.[1] The proposed rent increase for the three tenants receiving their notice in December 2014 was from $349 to $399, or 14.3%. The proposed rent increase for the single tenant receiving notice in January 2015 was from $309 to $379, or 22.6%.[2] Because the proposed rent increase exceeded the CPI-U, the Delaware Manufactured Home Relocation Authority ("Authority") was required to schedule a meeting between Bon Ayre and the affected home owner, or BACA as the homeowners'

---

[1] At arbitration, both parties agreed the applicable average CPI-U was 1.6% for the previous thirty-six month period. Appellant's Ex. A at 7.

[2] The proposed contract for this home owner, Mr. Powers, was submitted in exhibit A of the Appellant's opening brief and indicates that the proposed increase was from $309 to $399; however, the home owner testified at the arbitration hearing that the proposed increase was from $309 to $379. Appellant's Ex. A at 7.

representative, to discuss the reasons for the increase.[3]

The required meeting for the home owners receiving notice in December 2014 was held on January 23, 2015. The meeting for the single home owner receiving notice in January 2015 was held on February 24, 2015. The disputes of the home owners at these separate meetings were identical. Each home owner disputed that the market rent analysis justified the proposed rent increase and that the proposed increase was not related to operating, maintaining, or improving the community as required under 25 *Del. C.* § 7042.[4] The homeowners also disputed whether the

---

[3] 25 *Del. C.* § 7043(b).

[4] 25 *Del. C.* § 7042 states in pertinent part:

(a) A community owner may raise a home owner's rent for any and all 12-month periods governed by the rental agreement in an amount greater than the average annual increase of the Consumer Price Index For All Urban Consumers in the Philadelphia-Wilmington-Atlantic City area ("CPI-U") for the most recently available preceding 36-month period provided the community owner can demonstrate the increase is justified for the following conditions:

(1) The community owner, during the preceding 12-month period, has not been found in violation of any provision of this chapter that threatens the health or safety of the residents, visitors or guests that persists for more than 15 days, beginning from the day the community owner received notice of such violation; and

(2) The proposed rent increase is directly related to operating, maintaining or improving the manufactured home community, and justified by 1 or more factors listed under subsection (c) of this section.

(b) The Delaware State Housing Authority shall monitor the CPI-U and report to the Authority findings and recommendations relevant to the cost of rent in manufactured home communities in Delaware.

(c) One or more of the following factors may justify the increase of rent in an amount greater than the CPI-U:

(1) The completion and cost of any capital improvements or rehabilitation work in the manufactured home community, as distinguished from ordinary repair, replacement and maintenance;

(2) Changes in property taxes or other taxes within the manufactured home

meeting was held in good faith. The homeowners objected to the rent increase, and BACA filed two separate petitions for arbitration under 25 *Del. C.* § 7043(c).[5] The parties agreed to consolidate the two petitions for one arbitration hearing.

At the arbitration hearing, Bon Ayre presented three witnesses in support of their position. The first witness, James Rostoski ("Rostoski"), was a licensed real estate appraiser and was presented as an expert witness. Rostoski prepared a market study for Bon Ayre to determine the correct "market rate" for a lot in the Bon Ayre community. Rostoski used Barclay Farms, Southern Meadows, Wild Meadows, and Village Brook as comparable communities with which to conduct a comparable rent analysis. Rostoski visited Bon Ayre once, but never visited the other communities

---

community;

(3) Changes in utility charges within the manufactured home community;

(4) Changes in insurance costs and financing associated with the manufactured home community;

(5) Changes in reasonable operating and maintenance expenses relating to the manufactured home community including, but not limited to: costs for water service; sewer service; septic service; water disposal; trash collection; and employees;

(6) The need for repairs caused by circumstances other than ordinary wear and tear in the manufactured home community.

(7) Market rent.--For purposes of this section, "market rent" means that rent which would result from market forces absent an unequal bargaining position between the community owner and the home owners. In determining market rent relevant considerations include rents charged to recent new home owners entering the subject manufactured home community and/or by comparable manufactured home communities. To be comparable, a manufactured home community must be within the competitive area and must offer similar facilities, services, amenities and management.

(8) The amount of rental assistance provided by the community owner to the home owners under § 7021A of this title.

[5] One petition was filed for the three home owners who received notice in December 2014 and one petition was filed for the single home owner who received notice in January 2015.

in the analysis. Rostoski's report adjusted current monthly rental fees in the comparable communities for factors such as location, services included in the rent such as snow removal and lawn care, improvements, whether residency was limited to persons fifty-five years of age or older, and whether amenities such as community rooms and swimming pools were available for use by the residents. Based on these adjustments, Rostoski determined that the market rent for Bon Ayre was $465 per month.

Bon Ayre's second witness was James Draper ("Draper"), sales manager for Bon Ayre. Draper testified that rent for new lots was currently set at $399 per month for a one year lease and that nine year leases were available starting at $389 per month for the first year.[6] He also testified that he had only one sale and one pending sale in 2015. No homes were sold in 2014. Draper was also Bon Ayre's representative at the home owner meetings in January and February 2015. He testified that he handed out a packet of information that included Rostoski's report at both meetings.

Bon Ayre's third witness was Donna Finnocchiaro ("Finnocchiaro") who is employed by Lenape Properties Management, Inc. as the property manager of Bon Ayre. Finnocchiaro testified that brand new leases were at a monthly rate of $399 per month as of January 1, 2015.

Various witnesses for BACA testified to lot rent and amenities at Barclay

---

[6] Contract proposals for a nine year lease show that the per month rent is set at $389 for the first year, but increases each month thereafter. Rent in the ninth year is $521 per month, for an average increase of 3.8% per year over the course of the lease. *See* Appellant's Ex. A.

Farms, Wild Meadows, and reasons for moving to Bon Ayre. Among these witnesses was Larry Dougherty and Fred Neal. Larry Dougherty testified that he has lived in the Barclay Farms community since 2009, currently pays $475 per month in lot rent, and that the community owner imposed a 3% cap on lot rent increases. Fred Neal testified that has lived in Wild Meadow since 2003, and before a recent court decision his lot rent was $437 per month. No other witnesses testified to their current rent.

After hearing both parties, the Arbitrator interpreted section 7042 as allowing market rent to be used as a stand alone reason for increasing rent in excess of the CPI-U.[7] The Arbitrator determined that an interpretation requiring the proposed rental increase be directly related to operating, maintaining, or improving the community before any of the eight factors listed in subsection (c) could be considered was inconsistent with the stated purpose of the subchapter, and section 7042 was therefore inherently inconsistent and contradictory. The Arbitrator further found the statute to be redundant and noted the result of applying the statute would be that a community owner could never justify a rent increase by relying solely on "market rent." The Arbitrator concluded that the only logical way to interpret section 7042 was that "if the rent increase is not being sought for capital improvements, ordinary wear and tear or changes in operating and maintenance expenses, then it must be justified by market rent."[8]

The Arbitrator then proceeded to calculate an alternative valuation of market

---

[7] Appellant's Ex. A at 9.

[8] Appellant's Ex. A at 9.

rent for Bon Ayre. The starting point for the calculation was the average monthly lot rent at three comparable 55+ communities, Barclay Farms, Southern Meadows, and Wild Meadows. The average monthly lot rent rate of $454.55 was adjusted up 10% for permanent improvements found in Bon Ayre such as streetlights, sidewalks, and curbs. The amount was then adjusted down 5% for a lack of amenities, and further adjusted down 20% for services included in other rents but not in Bon Ayre's rent such as trash removal, lawn service, swimming pool, and a fitness center. The average monthly rent of $454.55 was adjusted down 15% to an amount of $386.37.

BACA has filed this timely appeal of the Arbitrator's decision.

## II. STANDARD OF REVIEW

"A community owner, [Home Owners Association], or any affected home owner may appeal the non-binding decision of the Arbitrator to the Delaware Superior Court."[9] "The appeal shall be on the record and the Court shall address written and/or oral arguments of the parties as to whether the record created in the arbitration is sufficient justification under the Code for the community owner's proposed rental increase in excess of CPI-U."[10] Restated, "[t]he Court must independently address arguments of the parties as to whether the record created in the arbitration is sufficient to justify an increase in rent above the CPI-U."[11]

---

[9] *Tunnell Companies L.P. v. Greenawalt*, 2014 WL 5173037, at *4 (Del. Super. Oct. 14, 2014).

[10] 25 *Del. C.* § 7044.

[11] *Tunnell Companies L.P.*, 2014 WL 5173037, at *4.

## III.  DISCUSSION

### A.  The Requested Rent Increase Was Not Justified Because the Record Contained No Evidence Showing the Requested Increase was Directly Related to Operating, Maintaining, or Improving the Community

On June 30, 2013, title 25, chapter 70, subchapter III of the Delaware Code went into effect.  This subchapter is titled "Affordable Manufactured Housing" and is hereinafter referred to as the "Rent Justification Act" or the "Act."  Its purpose "is to accommodate the conflicting interests of protecting manufactured home owners, residents and tenants from unreasonable and burdensome space rental increases while simultaneously providing for the need of manufactured home community owners to receive a just, reasonable and fair return on their property."[12]  The statute notes that "[o]nce a manufactured home is situated on a manufactured housing community site, the difficulty and cost of moving the home gives the community owner disproportionate power in establishing rental rates."[13]  The twin goals of the legislation are to "protect the substantial investment made by manufactured home owners" and to "provide manufactured home community owners with a fair return on their investment."[14]  To achieve these goals, rental space increases are limited by statute unless a community owner meets certain statutory requirements.

---

[12] 25 *Del. C.* § 7040.

[13] *Id.*

[14] *Id.*

9

The statutory requirements are found in 25 *Del. C.* § 7042(a).[15, 16] This two prong conjunctive test consists of three distinct elements and requires each element be met before rent may be increased in excess of the CPI-U. The second prong of the test is a compound condition requiring that the rent increase be directly related to operating, maintaining, or improving the community, *and* that the rent increase be justified by one or more of the factors listed in subsection (c). Subsection (c) lists eight factors that *"may* justify the increase of rent in an amount greater than the CPI-U."[17]

In *Tunnell Companies v. Greenawalt*, the Superior Court stated this rule as follows:

> A community owner may increase rent for any and all 12 month period rental agreements in an amount greater than the CPI–U only if the community owner can demonstrate the increase is justified. To justify such an increase, the community owner must demonstrate: (1) it has not had any health or safety violations that persist more than 15 days after it received notice of the violation during the previous 12–month period;

---

[15] 25 *Del. C.* § 7042(a) allows that the owner of a mobile home community may raise a home owner's rent by an amount in excess of the average annual CPI-U for the preceding thirty-six month period if:

> (1) The community owner, during the preceding 12-month period, has not been found in violation of any provision of this chapter that threatens the health or safety of the residents, visitors or guests that persists for more than 15 days, beginning from the day the community owner received notice of such violation; and
> (2) The proposed rent increase is directly related to operating, maintaining or improving the manufactured home community, and justified by 1 or more factors listed under subsection (c) of this section (emphasis added).

[16] This test is subject to considerable dispute by the parties.

[17] 25 *Del. C.* § 7042(c) (emphasis added).

> (2) the proposed increase is directly related to operating, maintaining, or improving the manufactured home community; and (3) the increase is justified by at least one of several factors. [18]

This statement of the rule for increasing rent in excess of the CPI-U was reiterated in *Bon Ayre Land LLC v. Bon Ayre Community Association* (*Bon Ayre I*).[19]  In both cases, the community owners were found to have violated the procedural requirements of 25 *Del. C.* § 7043, and thus an in depth analysis of the application of section 7042(c) was not required.  Nonetheless, the rule as stated in *Greenawalt* and *Bon Ayre I* clearly laid out three distinct elements that must be met in order to satisfy the Rent Justification Act's requirements for rent increases in excess of the CPI-U. The current case presents a direct challenge to the Superior Court's previous interpretations, so a full blown analysis of the rule is now appropriate.

When a statute is clear and unambiguous, there is no need for statutory interpretation.[20]  In these cases, a court's role is limited to an application of the literal meaning of the words.[21]  Ambiguity exists when "a statute is reasonably susceptible of different conclusions or interpretations."[22]  When a statute is ambiguous, methods

---

[18] *Tunnell Companies L.P.*, 2014 WL 5173037, at *2.

[19] *Bon Ayre Land LLC v. Bon Ayre Community Association*, 2015 WL 893256, at *2 (Del. Super. Feb. 26, 2015).

[20] *Ridgewood Manor II, Inc. v. Delaware Manufactured Home Relocation Auth.*, 2014 WL 7453275, at *5 (Del. Ch. Dec. 31, 2014) (citing *State v. Skinner*, 632 A.2d 82, 85 (Del.1993)).  *See also* 2A Sutherland Statutory Construction § 45:2 (2014).

[21] *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del. 1985).

[22] *Id.*

of statutory construction are employed to determine legislative intent.[23] The primary purpose when applying methods of statutory interpretation is "to determine and give effect to legislative intent."[24] This intent must prevail even if preserving legislative intent results in "an interpretation not consistent with the strict letter of the statute."[25] These methods require the statute be read in the aggregate rather than in parts, and that each section be "read in light of all others to produce a harmonious whole."[26] No words in a statute should be "construed as surplusage if there is a reasonable construction which would give them meaning, and courts must ascribe a purpose to the use of statutory language, if reasonably possible."[27] When applying these methods, "literal or perceived interpretations which yield mischievous or absurd results are to be avoided."[28] "Regardless of one's views as to the wisdom of the statute, our role as judges is limited to applying the statute objectively and not revising it."[29]

The legislative intent behind the Rent Justification Act is found in 25 *Del. C.* § 7040. Section 7040 first notes that manufactured housing is a vital source of

---

[23] *One-Pie Investments, LLC v. Jackson*, 43 A.3d 911, 914 (Del. 2012).

[24] *Id.*

[25] *Mayor and Council of Wilmington v. Dukes*, 157 A.2d 789, 793-94 (Del. 1960). *See also Hayward v. Gaston*, 542 A.2d 760, 768 (Del. 1988) ("If a literal interpretation of a statute leaves a result inconsistent with the general statutory intention, such interpretation must give way to general intent.").

[26] *Doroshow, Pasquale, Krawitz & Bhaya v. Nanticoke Mem'l Hosp., Inc.*, 36 A.3d 336, 343 (Del. 2012).

[27] *Chase Alexa, LLC v. Kent Cnty. Levy Court*, 991 A.2d 1148, 1152 (Del. 2010).

[28] *One-Pie Investments, LLC*, 43 A.3d at 914; *Dukes*, 157 A.2d at 793-94.

[29] In re *Adoption of Swanson*, 623 A.2d 1095, 1099 (Del. 1993).

affordable housing in Delaware, especially for lower-income households who otherwise would not be able to move into home ownership. This section also notes that manufactured home owners make substantial investments in their homes, and once a home is situated on a rental site, the difficulty and cost of moving the home gives the community owner "disproportionate power in establishing rental rates."[30] "The continuing possibility of unreasonable space rental increases in manufactured home communities threatens to diminish the value of manufactured home owners' investments."[31] This section specifically states that "[t]hrough this subchapter, the General Assembly seeks to protect the substantial investment made by manufactured home owners, and enable the State to benefit from the availability of affordable housing for lower-income citizens, without the need for additional state funding."[32] Section 7040 further recognizes the property rights of manufactured home community owners and seeks to provide them with a fair return on their investment. The stated purpose of the Rent Justification Act is "to accommodate the conflicting interests of protecting manufactured home owners, residents and tenants from unreasonable and burdensome space rental increases while simultaneously providing for the need of manufactured home community owners to receive a just, reasonable and fair return on their property."[33] Thus, the legislature seeks to balance these competing interests.

Reading section 7042 as a harmonious whole requires *all* subsections be read

---

[30] 25 *Del. C.* § 7040.

[31] *Id.*

[32] *Id.*

[33] *Id.*

in a way that renders no section superfluous. Section 7042(a) defines two conditions that must be met before a rental increase in excess of the CPI-U may be considered. The conditions are conjunctive. The first condition requires the community owner not have been found in violation of any of the provisions of title 25, chapter 70 that threatened the health or safety of residents, visitors or guests that persisted for more than fifteen days in the previous twelve month period. The second condition requires the proposed rent increase be directly related to operating, maintaining, or improving the community *and* justified by one or more factors in section 7042(c). Section 7042(a) contains the only language that permits a community owner to raise rent in excess of the CPI-U.[34] Section 7042(b) of requires the Delaware State Housing Authority to monitor the CPI-U and to report to the Authority "findings and recommendations relevant to the costs of rent in manufactured home communities in Delaware.[35]

Section 7042(c) lists eight factors that "*may* justify the increase of rent in an amount greater than the CPI-U."[36] The use of the word "may" indicates an indeterminate outcome. The eight factors in section 7042(c) may justify an increase in rent greater than the CPI-U, but on the other hand, they may not. When one reads section 7042(a) and section 7042(c) as a harmonious whole, it becomes apparent that any one of the factors in section 7042(c) will justify an increase in rent greater than

---

[34] Section 7042(a) begins by stating "A community owner *may raise a home owner's rent* . . . ." (emphasis added).

[35] 25 *Del. C.* § 7042(b).

[36] 25 *Del. C.* § 7042(c) (emphasis added).

the CPI-U only if the "proposed rent increase is directly related to operating, maintaining or improving" the community. If the General Assembly had intended that any one of the eight factors would be a stand alone justification for a rental increase, it would have used language indicating a determinate outcome such as "one or more of the following factors *will* justify the increase of rent in an amount greater than the CPI-U." To interpret section 7042 as allowing any subsection (c) element to operate as a stand alone justification for a rent increase in excess of the CPI-U requires a reading of subsection (c) without reference to the other parts of the statute, and would thus render subsections (a) and (b) surplusage. Because the rules of statutory construction disfavor a reading that renders any part of a statute as surplusage, allowing any subsection (c) factor to suffice as stand alone justification for a rent increase in excess of the CPI-U is disfavored.

*Requiring an increase in rent in excess of the CPI-U be directly related to operating, maintaining, or improving the manufactured home community is not inconsistent with legislative intent*

In the case at bar, Bon Ayre argues that market rent is sufficient as a stand alone element under the statute to justify a rental increase above the CPI-U. This interpretation echoes the Arbitrator's interpretation of the statute as stated in the Decision of the Arbitrator of April 23, 2015. The Arbitrator found that the requirement in section 7042(a), that the increase be directly related to operating, maintaining, or improving the community, was inconsistent with Act's stated purpose, and therefore inherently inconsistent and contradictory. The Arbitrator posited that "the statute in question is redundant and the result would simply be that

a community owner could never justify a rent increase by relying solely on 'market rent.'"[37]   However, to reach this interpretation, it is necessary to disregard section 7042(a)(2) and to ignore other possible interpretations that would not render parts of the statute surplusage.

Requiring that a rental increase be directly related to operating, maintaining, or improving the community is not inconsistent with the Act's purpose.  The stated purpose is to protect the substantial investment made by manufactured home owners and to provide manufactured home community owners with a fair return on their investment. Section 7040 states that the community owner acquires disproportionate power in setting rental rates once a home owner has placed his manufactured home on a lot.  In order to protect a home owner's investment, the General Assembly established protections with regards to rent increases.  These protections require a community owner to justify a rent increase in excess of the CPI-U and that any increase in excess of the CPI-U be directly related to operating, maintaining, or improving the community.  The General Assembly also built in protections for the community owner.  A community owner is allowed to increase rent up to the CPI-U with no justification whatsoever.  But, rather than limit a community owner to only an increase of up to the CPI-U, the statute also allows for larger increases when justified by certain enumerated factors and when related to operating, maintaining, or improving the community.  This allows a community owner to pass on costs to the homeowner that may degrade his return over time.  This ability to relay costs related

---

[37] Appellant's Ex. A at 9.

to the operating, maintaining, or improving the community to the home owner protects the community owner's return on his investment.

*Requiring an increase in rent in excess of the CPI-U be directly related to operating, maintaining, or improving the manufactured home community is not redundant*

In construing a statute, a court is required to strive for an interpretation that gives effect to legislative intent while at the same time giving meaning to all words in the statute. The Arbitrator's interpretation that is embraced by Bon Ayre fails in this regard. This interpretation fails to give meaning to section 7042(a)(2). On the other hand, BACA proposed an interpretation that gives effect to legislative intent and gives meaning to all words in the statute. Under this interpretation, the justification element in section 7042(c) establishes why the community owner is seeking a rental increase in excess of the CPI-U, and the "directly related" element in section 7042(a)(2) requires the increase in excess of the CPI-U be spent operating, maintaining, or improving the community. Although section 7042(c) lists some costs that would directly effect the cost of doing business, an exhaustive list would be neither practical nor necessarily complete. The market rent element allows the community owner to protect the return on his investment by allowing a rental increase in excess of the CPI-U for costs not specifically listed in section 7042(c). For example, an increase in costs to the community owner based on the generalized costs of doing business, the addition of a new service such as free Wi-Fi, or the contracting for the services of full time security or a social director could be recouped under the market rent justification.

Construing section 7042(a) as inconsistent with the Act's purpose defeats the goals of the legislation. In essence, Bon Ayre claims that protecting the property rights of community owners requires an interpretation that would allow a rent increase based solely upon market rent. This is wrong for two reasons. First, the statute's goal with respect to community owners is to protect their right to receive a just, reasonable and fair return. To that end, the statute allows for rent increases up to the CPI-U with no justification, and allows for increases in excess of the CPI-U when a community owner is faced with costs that would potentially degrade the return on investment. Second, allowing an increase based solely on market rent could lead to situations where a home owner is faced with an unreasonable or burdensome increase in rent even when there is no threat to a community owner's just, reasonable, and fair return on their investment. A community owner may offer a lower rate to induce home owners to place their homes in the community, and later raise rental rates to the "market rate" with impunity. In the present case, the rental increases were between 14.4% and 22.6%.[38] These are the types of rent increases the statute seeks to avoid. Allowing a community owner to increase rent based solely on a market rent justification does not balance the rights of the home owner and the community owner, it places the rights of the community owner in a position superior to that of the home

---

[38] Bon Ayre claims rent was not increased in the three years prior to the proposed increase, and the average yearly increase was therefore 7% per year under Bon Ayre's proposed increase, and less than 5% per year when based on the rent determined by the Arbitrator. Appellee's Ans. Br. at 3. Nothing in the statute prevents the retroactive application of an increase up to the CPI-U, but the increases in this case still exceed the statutory limit in this case, which is the CPI-U of 1.6% per year as stipulated by the parties.

owner.

Based on this interpretation of the statute, Bon Ayre has failed to meet the requirements of section 7042(a)(2) requiring that proposed rent increases be directly related to operating, maintaining, or improving the community, and thus a rent increase in excess of the CPI-U is not justified.

**B.     The Record From the Arbitration Hearing Does Not Contain a Sufficient Amount of Reliable or Competent Evidence to Justify an Increase in Rent Based on Market Rent.**

Section 7042 defines market rent as "that rent which would result from market forces absent an unequal bargaining position between the community owner and the home owners."[39]  A relevant consideration when determining market rent is "rents charged to recent new home owners entering the subject manufactured home community and/or by comparable manufactured home communities."[40]  Comparable communities are communities that are within the competitive area and offer similar services, amenities, and management.[41]  When relying on market rent as justification for increasing rent in excess of the CPI-U, "the community owner shall provide a range of rental rates from low to high, and when relevant the mean and median."[42]  The community owner must also disclose whether these rental rates were determined at arm's length, whether a related party has an ownership interest in any comparable

---

[39] 25 *Del. C.* § 7042(c).

[40] *Id.*

[41] *Id.*

[42] 25 *Del. C.* § 7043(b).

lot or community used, and the time relevance of the data.[43]

When the Rent Justification Act was initially passed in June 2013, section 7042(c)(7) stated that "relevant considerations include rents charged by comparable manufactured home communities in the applicant's competitive area."[44] This language was changed to read "relevant considerations include rents charged to recent new home owners entering the subject manufactured home community and/or by comparable manufactured home communities."[45] The 2014 amendment makes clear that rents advertised by a community owner can no longer be considered relevant. The statute now requires information that is more *specific*. The amendment must be read to require a showing of rents actually charged to new home owners entering either the subject manufactured home community or a comparable manufactured home community.

Although the statute states that rents charged to new home owners entering the subject community or a comparable community are relevant considerations, it does not further specify what factors are to be considered in determining market rent. The statute defines comparable manufactured home communities as those with "similar facilities, services, amenities and management," but does not require these factors be used in determining market rent for a specific community. Nor does the statute forbid the consideration of other factors such as location within the competitive area or site improvements. The determination of what factors affect market rent and the extent

---

[43] *Id.*

[44] 79 Del. Laws ch. 63, § 1 (2013).

[45] 79 Del. Laws ch. 304, § 1, 6 (2014).

20

to which they affect market rent are best left to those with expertise in the field. Thus, any factor affecting market rent may be presented by either side so long as the factor is supported by credible evidence. The only mandatory inclusion is the showing of rents charged to recent new home owners entering the subject manufactured home community and/or by comparable manufactured home communities.

*A market rent report is not fundamentally flawed when it uses factors not explicitly required by the statute*

In the case at bar, BACA first claims the report submitted by Rostoski is fundamentally flawed and should be disregarded in its entirety. Bon Ayre claims that the Rostoski report on market rent comparisons supplies the type of information required under the statute. Rostoski was admitted as an expert witness and his credentials were not challenged at the arbitration hearing.[46] No expert witness was called by BACA to dispute Rostoski's findings, but Rostoski was questioned by opposing counsel on various findings in the report. In challenging the report, BACA first argues that Rostoski used the wrong definition for market rent. Rostoski's report defined market rent as "[t]he most probable rent that a property would bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, TI, concessions, renewal and purchase options, and tenant improvements."[47] Although this definition does not exactly match the statutory definition, the definitions are

---

[46] Appellant's Ex. A at 2.

[47] A-47.

substantially similar. Rostoski's definition embraces the statute's definition and adds other factors that would be relevant in predicting market rent. Therefore, Rostoski's definition of market rent does not create an issue so dire as to fundamentally flaw the report.

BACA further argues Rostoski's report considered location when the act does not consider location as a factor to be considered in calculating market rent, and devalued or ignored criteria such as inclusions in rent, amenities, and management. As noted above, the statute states criteria for determining "comparable communities," but is silent as to what factors must be considered when determining market rent with the single exception of "rents charged to recent new home owners entering the subject manufactured home community and/or by comparable manufactured home communities." Rostoski was admitted as an expert and relied on criteria he deemed relevant to determining Bon Ayre's market rent in the competitive area. Nothing in the statute precludes Rostoski from considering the factors relied upon in his report. However, Rostoski did fail to consider "rents charged to recent new home owners entering the subject manufactured home community and/or by comparable manufactured home communities," and that failure will be discussed below.

Moreover, this Court has previously noted its approval of the type of information contained in Rostoski's report. Referring to the Rostoski report in *Bon Ayre I*, this Court stated:

> The report was over 37 pages long and included detailed descriptions of each community and the surrounding area. The report included definitions, maps, pictures and a table with a summary that included side by side comparison of pertinent information such as monthly rent, age

> restrictions, the number of units, amenities, improvements, and the services which are included in the rent. Most importantly, the report explained the reconciliation process where the appraiser takes the relevant elements of comparison, assigns them a value, and uses them to calculate an appropriate market rent. Under the Act, this report is precisely the type of information that should be on hand prior to deciding to raise the rent above the CPI-U . . . . [48]

The Court made no comment as to the competency of the information contained in the report, but noted by inference that factors not listed in the statute may be used for market rent analysis.

BACA also challenges the competency of the Rostoski report because the appraiser did not provide an adequate foundation for the market rent recommendation. Rostoski testified that it was difficult to do an exact comparison because each community within the competitive area offered different amenities and services. Based on his experience, Rostoski adjusted rents in comparable communities upward or downward by a certain percentage based upon criteria such as location, inclusions, improvements, amenities, and whether the community was a 55+ community. Rostoski adequately explained his rational for each adjustment. He admitted he did not personally visit each comparable community and only visited Bon Ayre one time, but not visiting a community does not render the evidence incompetent per se. These explanations and valuations could have been countered by a rebuttal expert witness, but none was called. Therefore, BACA's challenge based upon the competency of the appraiser's report fails.

---

[48] *Bon Ayre I,* 2015 WL 893256, at *9.

*The Statute requires evidence of rents charged to recent new home
owners entering the subject manufactured home community and/or
by comparable manufactured home communities*

BACA next claims that no evidence of rents actually paid by new home owners entering Bon Ayre or a comparable community was ever presented. Bon Ayre counters this claim by stating that the evidence showing Bon Ayre presently charges $399 per month for a one year lease and offers a nine year lease starting at $389 per month is undisputed. Bon Ayre also claims it is undisputed that comparable communities are charging in excess of $400 and up to $573 per month. The statute as amended requires a showing of rents charged to recent new home owners entering the subject manufactured home community or comparable communities. At the arbitration hearing, Dick Draper, site manager and sales manager at Bon Ayre, testified that one home had been sold in 2015 with another sale pending, and no homes were sold in 2014.[49] No other evidence showing rents actually charged to *new* tenants in Bon Ayre or other comparable communities was presented.

The statute does not require a set number of rents charged to new home owners be shown, but one completed sale and one pending sale in a two year period is not adequate. The rent figures used for comparable communities are not acceptable under the statute because there was no showing that the rent figures were actually charged to new home owners moving their manufactured homes into the community.[50]

---

[49] A-114 at 80.

[50] Bon Ayre claims rents in comparable communities were presented by Mr. Dougherty as to Barclay Farms and Mr. Neal as to Wild Meadows, but these rents were rents paid by existing tenants, and not rents paid by new home owners moving into the community.

24

Although it may be difficult to gain access to rent figures actually charged to new home owners entering a comparable manufactured home community, they are nonetheless required by statute if rent in a comparable community is considered. Because Bon Ayre failed to make an adequate showing of rents being charged to new home owners in the Bon Ayre community, and made no showing of rents charged to new home owners moving into a comparable community, they have failed to meet the requirements of section 7042(c)(7).

*The Arbitrator's decision to grant a rent increase in excess*
*of the CPI-U was not supported by substantial evidence*

BACA claims the Arbitrator's decision to raise rent in excess of the CPI-U, even though not granting Bon Ayre the full increase they sought, was not supported by substantial evidence. In granting the rent increase, the Arbitrator discounted portions of the Rostoski findings and relied on other portions. The fatal flaw in the Arbitrator's market rent analysis is that Bon Ayre's rent was compared to rents in comparable communities, but there was never a showing of rental figures *actually charged* to new home owners entering the comparable community. To make any determination under section 7042(c)(7), evidence of rental fees charged to new home owners is required. Because this information was not placed in evidence, the Arbitrator's decision could not have been supported by substantial evidence.

### C.    The Statute is Not Ambiguous, Vague, and Unworkable

Although not raised as a counterclaim, Bon Ayre claims in their answering brief that the statute is unconstitutional because it is ambiguous, vague, and unworkable. Bon Ayre argues the statute provides for non-binding arbitration that

is in fact binding unless reversed on appeal to the Superior Court. Bon Ayre further argues that the statute is ambiguous. BACA claims the statute is constitutional and that the arbitration is non-binding in the sense that either party may appeal the arbitrator's decision to the Superior Court.

Section 7044 of the Act states "[t]he community owner, the home owners' association, or any affected home owner may appeal the decision of the arbitrator within 30 days of the date of issuance of the arbitrator's decision."[51] The arbitration clause contains no limits on the availability of the appeal process, and the arbitration is therefore non-binding.

Bon Ayre argues that the non-binding language is inconsistent and erroneous because the arbitrator's decision is in fact binding unless reversed on appeal. To highlight the claimed inconsistency, Bon Ayre first points to a decision in *Tunnell Companies, L.P. v. Greenawalt* in which the Superior Court referred to the Arbitrator's decision as a "recommendation,"[52] and then to a subsequent decision in *Pot-Nets Coveside Homeowners Association v. Tunnell* in which the Superior Court ruled the Arbitrator's decision to dismiss could not be disturbed.[53] However, the decision not to disturb the Arbitrator's decision to dismiss was based on a

---

[51] 25 *Del. C.* § 7044.

[52] *Tunnell Companies, L.P.*, 2014 WL 517037, at *3 ("Tunnell had not met its burden of proof in justifying the rent increases. As such, Arbitrator recommended Tunnell reduce the rent increases to the CPI-U.").

[53] *Pot-Nets Coveside Homeowners Association v. Tunnell*, 2015 WL 3430089, at *6 (Del. Super. May 26, 2015) ("It is clear, the Court, based on the plain, literal language of 25 *Del. C.* § 7044, does not have jurisdiction to hear disputes concerning anything other than whether a community owner's proposed rent increase above the CPI–U is justified.").

jurisdictional analysis and not on the Arbitrator's decision regarding the justification of a rent increase in excess of the CPI-U. In the subsequent case, the *Pot-Nets* court determined that "the General Assembly's specific use of 'the record created in the arbitration is sufficient justification under the Code for the community owner's proposed rental increase in excess of the CPI–U[,]' and exclusion of any other issue or topic following 'as to whether,' was purposeful," and therefore there was no jurisdictional basis on which the Court could overrule the Arbitrator's decision to dismiss.

Bon Ayre claims "[a] statute that forces this Court to refer to the arbitrator's decision as a 'recommendation' in one case and as untouchable and beyond redress even if wrong in another case cannot be deemed workable and capable of rational application and therefore, is impermissibly vague."[54] "To succeed, however, the complainant must demonstrate that the law is impermissibly vague in all of its applications."[55] Bon Ayre has failed to make an argument that the statute is impermissibly vague in all of its applications. Bon Ayre further claims that a court should not be placed in the intolerable position of having to deal with the numerous ambiguities and inconsistencies they see in this statute. Nonetheless, it is the job of the courts to interpret the laws passed by the General Assembly. Part of that job is resolving ambiguities and inconsistencies that may exist within a statute. BACA has admitted that there may be ambiguities in the subsection regarding market rent, and

---

[54] Appellee's ans. br. at 24.

[55] *In re Kennedy*, 472 A.2d 1317, 1330 (Del. 1984).

the *Pots-Nets* court referred to parts of section 7043 regarding meetings between the parties as the epitome of ambiguous, but these sections are not so ambiguous that a court cannot fashion an interpretation that implements legislative intent. For these reasons, this Court finds the statute is constitutional.

## CONCLUSION

The requested increase in rent in excess of the CPI-U is not justified and not in compliance with 25 *Del. C.* § 7042. Therefore, any rent increase in excess of the CPI-U is **DENIED**. There has not been sufficient justification for the proposed rent increase based on operating, maintaining, or improving the community. There also has not been sufficient justification based on market rent. Bon Ayre's challenge to the constitutionality of the statute fails, and is without merit.

IT IS SO ORDERED.

/s/ William L. Witham, Jr.
Resident Judge

WLW/dmh