**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| PAUL J. HANNAN, M.D., | ) | |
| Appellant, | ) | |
| v. | ) | C.A. No. N18A-02-001 JAP |
| DELAWARE BOARD OF MEDICAL LICENSURE AND DISCIPLINE, | ) | |
| Appellee. | ) | |

**<u>MEMORANDUM OPINION</u>**

Appellant is a physician whose license was revoked by the Board of Medical Practice and Licensure for, in the words of the Hearing Officer, "enabling a criminal drug gang in Pennsylvania by providing them with a regular source of controlled substance prescriptions to be sold on the street." The physician now seeks a stay of the revocation of his license pending the results of this appeal. It is manifest on the face of his application that he has not alleged any substantial issue to be raised on the appeal. Therefore, even though the State has stipulated to a stay, the court will deny it.

## A. Facts

The Board summarized the evidence before the Hearing Officer in part as follows:

> Based on the testimony of the State's expert, the hearing officer found as a matter of fact that Dr. Hannan's practice of prescribing opioids ignored a number of "red flags," that indicate that his patients were seeking controlled substances for non-therapeutic purposes. Dr. Hannan requested MRI reports from his patients at the time of their initial presentation, but made little to no effort to secure any charting of prior pain management physicians. Dr. Hannan ignored point-of-care urine screens that indicated patients may be taking prescriptions, or other opioids, that he was not prescribing. Dr. Hannan required the execution of a pain management contract, but did little to enforce the terms of these agreements. Physical examinations were never performed, pursuant to the testimony of the patients highlighted in this hearing, and this is corroborated by the medical records that include no indication that physical examinations were performed. Dr. Hannan's medical records hardly ever included diagnoses, and medications were increased without documented rationale. Dr. Hannan's files did contain "short form" and "long form" disclosures about the risks and benefits of taking controlled substances, but the hearing officer found these were fill in the blank forms that weren't filled in, and referenced discussions of risks and benefits occurring elsewhere without documentation of any other discussion of the risks and benefits. The hearing officer found as a matter of fact the Dr. Hannan engaged in discussions with his patients including discussions of Dr. Hannan's Nurse Practitioner's family situation, as well as multiple conversations about Dr. Hannan being investigated by the DEA. Finally, the hearing officer found as a matter of fact that on April 22, 2015, Dr. Hannan was arrested and charged with knowingly and unlawfully carrying a concealed loaded handgun in his briefcase, a misdemeanor offense for which he pled guilty, but successfully completed probation before judgment.

2

The State based its case against Dr. Hannan on his treatment of eight patients. The court need not detail the evidence relating to each patient at this point. Suffice it to say, the Board found that the "record of how these patients were treated is deplorable." The following are illustrative points:

- Dr. Hannan repeatedly prescribed opioid medications for patients without documenting any justification for doing so. He increased dosages even though there was no report of new symptoms or increase pain, and in at least one case ordered an increase in dosage even though he recorded that the patient reported she was doing well.

- Urine drug screens frequently were negative for the opioids he was prescribing, suggesting that the patient might be diverting the medication rather than taking it.

- On some occasions Dr. Hannan prescribed Oxymorphone (a drug with twice the potency of Oxycodone) without any justification being apparent from his records.

- The Pennsylvania Prescription Monitoring Program ("PMP) record shows that roughly 53 of Dr. Hannan's patients filled their prescriptions in Pennsylvania

3

pharmacies. The PMP for one patient illustrates how quickly and freely he handed out prescriptions for pain killers:

- o Initial prescription: 90 Oxycodone (30 mg.) and 56 Oxycodone (15 mg).

- o Prescription changed to 84 30mg and 84 15mg. later.

- o When patient reported this was "not enough" Dr. Hannan increased the Oxycodone 30mg tabs from 84 to 160.

- o April 11, 2013: Appellant prescribed 160 Oxycodone 30mg tabs for the patient.

- o Six days later (April 17) he prescribed 58 Oxycodone 5mg tabs for the same patient.

- o May 10, 2013: Appellant prescribed 124 Oxycodone 30mg and 62 Oxymorphone 5mg tabs to the patient.

- Many of Dr. Hannan's patients came from out of state. According to one patient ostensibly living in Elkton, MD, Dr. Hannan knew that the patient actually resided in Kentucky and travelled by train to Elkton to obtain

4

prescription. Another patient estimated that 35 to 40 of Dr. Hannan's patients resided in Shamokin, Pennsylvania, which is 115 miles (and roughly a three-hour drive) from appellant's office.

- One patient wore an audio recording/transmitting device to a visit with Dr. Hannan. The records prior to the recorded visit show that Dr. Hannan increased the patient's dosage of Oxycodone even though the patient advised of a "2" on a pain scale of 0 to 10. The recording shows that the patient told Dr. Hannan that he sold half of his prescribed drugs to support his family, and later told appellant he intended to sell half of the drugs. Dr. Hannan advised the patient that such activity was a criminal offense, whereupon the patient told Dr. Hannan he intended to continue selling the drugs. Nevertheless Dr. Hannan prescribed 150 tabs of Oxycodone 30mg and 60 tabs of Methadone 10mg "to prevent withdraw."

The Hearing Officer observed that:

> The evidence in this case establishes that Dr. Hannan was enabling a criminal drug gang in Pennsylvania by

5

> providing them with a regular source of controlled substance prescriptions to be sold on the street.

The Board had a similar view of the evidence, concluding:

> Dr. Hannan's practices show a clear priority on money-making at the expense of appropriate patient care. There is a real concern for public safety.

### B. The court will not agree to the stipulated stay

The State and the appellant have stipulated that this court stay the Board's decision pending the outcome of this appeal. It is manifest from the papers that the sole purpose of the stay is to prevent (for the time being at least) Florida medical authorities from learning the Delaware Board's revocation of Dr. Hannan's license. Dr. Hannan is now treating patients for pain management in Florida, which apparently includes prescription of narcotic pain medications. The purpose of the motion is to prevent (for the time being at least) Florida authorities from learning that his license has been revoked in Delaware. According to his motion:

> Appellant continues to practice in the area of pain management medicine in Tampa, Florida. Without a stay, and without being afforded his constitutional due process rights, the discipline will be made public and placed on the National Practitioner Database. * * * Appellant's patients, for the most part, suffer from chronic and life-altering pain and rely upon his practice for obtaining relief from that pain through, in

6

many instances, the prescription of prescription medicine that contains narcotics.

Despite the fact that the Board (at the State's urging) found that Dr. Hannan poses a threat to the community, the State has agreed stipulated stay which would effectively allow Dr. Hannan to continue prescribing narcotic pain killers to patients in Florida.[1]

As the parties recognize,[2] the court is not bound by their stipulation. The Administrative Procedures Act prohibits this court from issuing a stay unless it finds, among other things, that the appellant has a substantial chance of success on the merits. The Administrative Procedures Act provides:

> When an action is brought in the Court for review of an agency regulation or decision, enforcement of such regulation or decision by the agency **may be stayed by the Court only if it finds, upon a preliminary hearing, that the issues and facts presented for review** are substantial and the stay is required to prevent irreparable harm.[3]

---

[1] The stipulation would prevent Dr. Hannan from practicing medicine in Delaware during the pendency of this appeal, which seems to be somewhat of a Pyrrhic victory for the State of Delaware since he no longer resides here but rather lives in Florida.

[2] In a cover letter transmitting the stipulation to the court, the Deputy Attorney General representing the Board wrote that the parties have agreed "subject to the approval of the court, to a Stipulated Order."

[3] 29 *Del. C.* § 10144 (emphasis added).

7

As discussed below, the court finds appellant has little, if any, chance of success on the merits. Put another way, he has not presented issues and facts that are substantial.

Moreover, there are policy considerations which weigh heavily against granting the stay in this case. This court is reluctant to be a party to what is essentially a contrivance (albeit a lawful one) to prevent the Florida authorities from promptly learning of the Delaware Board's disciplinary action. Florida, like all states, relies in part upon information supplied by the National Practitioner Data Bank,[4] and a stay would delay transmission of the Delaware Board's revocation to the Data Center which in turn would delay the Florida authorities from learning of that revocation. This court will not enter a stay for the sole purpose of preventing the Florida Department of Health from learning information which may (or may not be) relevant to the health and safety of the people of that state.

---

[4] *See* Fla. Stat. Ann. § 456041(1)(b)("The physician profiles shall reflect the disciplinary action and medical malpractice claims as reported by the National Practitioner Data Bank, and shall include information relating to liability and disciplinary actions obtained as a result of a search of the National Practitioner Data Bank.").

*C. Dr. Hannan's contentions in his motion for a stay*

The following contentions can be gleaned from Dr. Hannan's motion:

1. The Hearing Officer erred when he denied the doctor's request for a continuance.

2. The Hearing Officer erred when the State's expert was permitted to testify by telephone.

3. The Hearing Officer erred when he permitted the State to call its witnesses in a "piecemeal fashion, out of order."

4. The Hearing Officer erred when he allowed the State's expert to offer an opinion "based on a review of records, but had no personal knowledge of the underlying facts."

5. It was constitutional error to permit the State's witnesses to offer hearsay testimony.

6. The State's decision to use hearsay testimony and not call the eight patients involved deprived the Hearing Officer of the opportunity to assess the patient's credibility.

7. The Hearing Officer erroneously excluded testimony by Dr. Hannan about an electronic record system reflecting prescriptions for one of the eight patients because the State had not seen the system.

8. The State called a witness whose only testimony was that Dr. Hannan's medical assistant was "tattooed" and appeared to be a security guard.

9. The Hearing Officer based his decision in part on evidence that Dr. Hannan was arrested in Delaware for carrying a concealed firearm in his briefcase

Virtually all of Dr. Hannan's arguments must be quickly dismissed because of the limited scope of this court's review in administrative proceedings. In administrative appeals this court's review is limited to a determination whether the "decision is supported by substantial evidence and is free from legal error."[5] This court has recently described the scope of its review of decisions of the Board of Medical Practice and Licensure:

> The Superior Court has jurisdiction to review a decision of the Board on appeal pursuant to the Delaware *Administrative Procedures Act.* The duty of

---

[5] *Haggerty v. Board of Pension Trustees*, 2018 WL 454501, at *4 (Del. Jan. 18, 2018).

10

> the reviewing Court is to examine the record of the proceedings below to determine if (1) there is substantial evidence to support the Board's findings and conclusions and (2) the Board's decision is free from legal error. In making its assessment, the Court is not authorized to make its own factual findings, assess credibility of witnesses or weigh the evidence. Substantial evidence is greater than a scintilla and less than a preponderance. If the Board's findings and conclusions are found to be based upon substantial evidence and there is no error of law, the Board's decision must be affirmed.[6]

The narrow scope of review is intended to prevent reviewing courts from getting into the weeds of discretionary and evidentiary rulings by the administrative tribunal. Yet that is exactly what Appellant is asking this court to do.

Dr. Hannan casts his arguments in due process terms. He fails to explain, however, why alleged errors by the Hearing Officer have (either singly or collectively) deprived him of due process. For example, the court is at a loss to understand how testimony that a medical assistant was "tattooed and appeared to be a security guard" deprived him of a constitutional right.

Moreover, many of the alleged deprivations of due process have been specifically rejected as such or are in fact routine practice in this court and elsewhere. For example:

---

[6] *Sokoloff v. Board of Medical Practice*, 2010 WL 5550692, at *5 (Del Super. Aug. 25, 2010) (emphasis in original).

11

- Dr. Hannan claims that he was deprived of his right to due process because the Hearing Officer allowed hearsay testimony. It has long been the law, however, that the use of hearsay in administrative proceedings in and of itself does not offend the Due Process Clause.[7] According to the Delaware Supreme Court "The Due Process clause has never been read to mean that the admission of hearsay evidence in an administrative type proceeding is a violation of that clause, and we decline to accept that reading today."[8]

- It is true that hearsay cannot form the *sole* basis for an administrative decision,[9] but that is not the case here. Dr. Hannan argues that "not one witness called by the State had any knowledge of the facts to which they were testifying."  This does not equate to an administrative decision based solely on hearsay—the Hearing Officer's

---

[7]   *See Qijano v. Ascroft,* 2004 WL 2823312, at *1 (9th Cir. Dec. 9, 2004); *see also, Williams v. United States Dept. of Transportation,* 781 F.2d 1573, 1578 n.7 (11th Cir. 1986); *Burgin v. Berryhill,* 2017 WL 4249729, at *5 (W.D. Okla. Sept. 1, 2017).
[8]   *In re Kennedy,* 472 A.2d 1317, 1329 (Del. 1984).
[9]   *Crooks v. Draper Canning Co.,* 1993 WL 370851, at *1 (Del. Sept. 7, 1993).

Recommendation is chock-full of references to Dr. Hannan's records and his own testimony.

- Dr. Hannan complains that the State's expert "offered opinion testimony based on his review of the records, but had no personal knowledge of any of the underlying facts." It is again difficult to see how this amounts to a constitutional violation, as this sort of thing happens every day in courts around the nation, including Delaware's. Both the Delaware[10] and Federal[11] Rules of Evidence permit an expert to base his or her opinion upon facts made known to the expert.

- Dr. Hannan complains that the State's expert was permitted to testify by telephone. However, transcripts of witness depositions are routinely read into the record in lieu of the witness's live testimony. The civil rules of this court provide that "any part or all of a deposition, so far as admissible under the rules of evidence applied

---

[10] D.R.E. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing.").

[11] F.R.E. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.").

[may be read] as though the witness were then present and testifying."[12]

- Appellant argues the Hearing Officer erred by permitting the State's witness to testify in piecemeal fashion and out of order. But trial courts have discretion over "the mode and order of interrogating witnesses and presenting evidence."[13] The same is surely true of the Hearing Officer.

Appellant also argues that the Hearing Officer erred when he denied Appellant's motion for a continuance of the hearing. The standard of review here is whether the Officer acted capriciously. The Delaware Supreme Court put it this way: "a discretionary ruling by a trial court or administrative body on a motion for a continuance will not be set aside unless that decision is unreasonable or capricious."[14] The record amply shows that the Hearing Officer did not act unreasonably or capriciously.

Dr. Hannan (who was proceeding without counsel at the time) waited until the eve of the hearing to request a continuance. The

---

[12]  Super. Ct. Civ. R. 32(a).
[13]  D.R.E. 611(a).
[14]  *In re Kennedy,* 472 A.2d at 1331.

14

hearing was set to begin on Monday, July 24, 2017. On the evening Thursday, July 20, after the close of business, Dr. Hannan requested the continuance for the first time by way of an email to the investigator in his case.[15] In that email Dr. Hannan asserted that:

- Because of financial difficulties he was unable to afford counsel for the hearing (Dr. Hannan had been represented earlier in this matter by an attorney).

- He could not afford to fly back to Delaware to attend the hearing.

- He works full time to pay his bills and spouse and child support obligations. Even a small diminution in his income would make it difficult for him to keep up with those obligations.

- He was unaware of the identity of the patients whose care gave rise to the charges.

---

[15] The record shows that Dr. Hannan was aware of the email address of the Deputy Attorney General representing the Board in this case because the deputy had previously communicated with him by email.

- He requested discovery in the form of the records of those patients.

- He needed a "significant amount of time" to review those records once he gets them.

The State responded to Dr. Hannan's request the morning of Friday, July 20. In that response the State asserted:

- Dr. Hannan must have known of the patients' identities because his records for those patients were subpoenaed from him in the fall of 2015. He was interviewed about each of those patients in October, 2015.

- Dr. Hannan received formal notice of the State's complaint on November 18, 2016.

- Although Dr. Hannan had made no document requests and the State had no obligation to provide him documents, the State sent all of its exhibits to him in early June, 2017.

- The Deputy Attorney General representing the Board spoke with Dr. Hannan by telephone in June 2017, at which time the doctor expressed surprise

16

this had not all gone away. He confirmed to the Deputy that he was available for the scheduled hearing and made no request for a delay.

The Hearing Officer did not give Dr. Hannan's request short shrift. He consulted with the parties the morning after Dr. Hannan sent his email request for a continuance to the investigator and wrote an explanation why he was denying the requested continuance. Appellant's delay in requesting the delay alone renders the Hearing Officer's decision to deny the request reasonable and non-capricious.

Because Dr. Hannan has little or no chance for success on the merits of his appeal, his application for a stay is **DENIED.**

February 23, 2018      _____

           John A. Parkins, Jr.
           Superior Court Judge

oc:    Prothonotary

cc:    Daniel A. Griffith, Esquire; Kaan Ekiner, Esquire, Whiteford
       Taylor Preston LLC, Wilmington, Delaware
       Stacey X. Stewart, DAG, Department of Justice, Wilmington,
       Delaware